Edward **CHIN**, Petitioner,

v.

**UNITED STATES** of America, Respondent.

No. CV 92–4113(RR).

United States District Court,
E.D. New York.

July 28, 1993.

Lipsitz, Green, Fahringer, Roll, Salisbury & Cambria, by Herald Price Fahringer, Diarmuid White, New York City, for petitioner.

Zachary W. Carter, U.S. Atty., E.D.N.Y. by Martin Coffey, Asst. U.S. Atty., Brooklyn, NY, for respondent.

### MEMORANDUM AND ORDER

RAGGI, District Judge:

Edward Chin, who was convicted in 1990 after a jury trial of two counts of transporting child pornography in foreign and interstate commerce, 18 U.S.C. § 2252(a)(1) (1988 & Supp. III 1991), and whose conviction was affirmed the following year by the Court of Appeals, *United States v. Chin,* 934 F.2d 393 (2d Cir.1991), now petitions this court to vacate his conviction pursuant to 28 U.S.C. § 2255 (1988). At trial, Chin had raised an entrapment defense. The critical issue in dispute was his predisposition to commit the crimes charged. Chin here contends that the

evidence adduced was insufficient as a matter of law to establish predisposition. Having carefully reviewed the submissions of the parties, and re-read the trial transcript, this court finds that Chin's claim is without merit. The petition to vacate the conviction is denied.

### Factual Background

The facts of this case are viewed in the light most favorable to the government, as they must be when a challenge is made to the sufficiency of the evidence supporting a jury verdict. *See, e.g., Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Weiss,* 930 F.2d 185, 191 (2d Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 133, 116 L.Ed.2d 100 (1991).

The case arose, as do many child pornography prosecutions, out of an undercover investigation conducted by the United States Postal Service. In order to identify persons interested in sending or receiving child pornography through the mails, postal inspectors set up fictitious companies and pen pal clubs. Sometime in mid–1986, Edward Chin received a solicitation letter from one of these entities, Far Eastern Trading Company.[1]

As many of you know, much hysterical nonsense has appeared in the American media concerning "pornography" and what must be done to stop it from coming across your borders. This brief letter does not allow us to give much comments; however, why is your government spending millions of dollars to exercise international censorship while tons of drugs, which makes yours the world's most crime ridden country are passed through easily. We have read the comments of Mr. Von Rabb of your Customs Service concerning the efforts of his agents to find "children's pornography" and we find that many of you are denied a product because of that agency. After conversation with enlightened Americans, we have found that if material

is given to your post without a Customs inspection, a search warrant must be gotten in order to open your mail.

For those of you who have enjoyed youthful material from publishers such as COQ, Color Climax, Rodox and others, we have devised a method of getting these to you without prying eyes of U.S. Customs seizing your mail. All material that you order from our company will be sent to you through our branch office in the U.S. Virgin Islands. After consultations with American solicitors, we have been advised that once we have posted our material through your system, it cannot be opened for any inspection without authorization of a judge.

If you want further information, please complete the following coupon and disclaimer and post it to the listed address.

Petitioner's Mem. (App. D).

Mr. Chin, who was approximately 28–years of age at the time he received this letter, is a highly-intelligent man. He earned a Masters Degree in Business Administration from the Wharton School of Finance, and, at the time of trial, was director of large scale projects for the New York City Department of Housing Preservation and Development. By his own admission, his interest in pornography dated to his teenage years. Originally his purchases were limited to adult magazines, acquired in Times Square. By his later teens, however, he was fantasizing about female juveniles engaged in sexually explicit activity. Although Mr. Chin claimed at trial never to have purchased any child pornography before receiving the Far Eastern Trading Company letter, this testimony was contradicted by his own post-arrest statements admitting his 1984 acquisition in Italy of "Sweet Linda," a child pornography magazine found in his briefcase at the time of his arrest. Chin's passport confirmed a trip to Milan in July of 1984.[2]

At trial, Chin also admitted being sexually excited by the Far Eastern Trading Compa-

---

1. It was unclear how Chin was selected to receive this mailing.

2. Chin testified that his post-arrest statement was false. He claimed to have acquired the magazine in Times Square in 1988. It was, of course,

for the jury to assess petitioner's credibility. For purposes of determining the sufficiency of the evidence, this court must assume that all conflicts were resolved in favor of the prosecution.

ny letter, because it offered "something concrete" that related to his own fantasies. In June 1986, he responded to the solicitation, and, within a few weeks, he received a catalog graphically describing available child pornography and listing prices. Chin promptly ordered two magazines. When these items were not forthcoming, petitioner wrote "a number of letters" inquiring as to his order. Eventually, he received a letter from Far Eastern explaining that a shipment of their goods had been sunk near Panama. At trial, Chin stated that he was disappointed by this news: "I was very sad because ... I placed an order and I wasn't going to get the order that I placed." Trial Tr. at 149.

In the fall of 1986, postal inspectors directed another solicitation from a fictitious company, Candy's Love Club, to petitioner.

> Are you an individual who believes in the right to choose his own sexual preference? If so, then join the club! Take a few minutes and help us by answering the attached questionnaire. Do not identify yourself unless you desire to join the club and receive correspondence from us. Our purpose is to protect our first amendment right to read whatever we please. Help our common cause and let your voice be heard.
>
> WE WANT SUPPORT NOT YOUR MONEY!
>
> If our supplier of mailing lists made a mistake by including your name then please disregard this material.

Petitioner's Mem. (App. F).

Chin accepted the invitation to join the club and returned a completed questionnaire. Of seventeen listed categories of sexual material, he identified his first and second areas of interest as (1) pre-teen heterosexual sex, and (2) heterosexual sex between children 13 to 16 years old. Chin further responded that he usually obtained material pertaining to his interests in Europe.

Thereafter, Chin received newsletters from the club, containing advertisements from persons interested in a variety of sexually explicit material, including child pornography.[3] Petitioner responded to ten advertisements, indicating an interest in trading photographs, videos, or magazines of pre-teen and teen-age girls.

In May of 1988, a postal inspector posing as one of the advertisers, "Ted from Medford," began corresponding with Chin. His initial letter stated:

> In response to your inquiry I have many hot photos of girl subjects both white and oriental, pre-teen and teen. I also have some magazines of Orientals by way of Bangkok, Thailand. I'll match whatever you send in quantity and quality. One hot photo gets you one in return. Same with the mags. I reserve the right to return anything that I dislike back to you. You of course have the same right. Discretion assured and expected in return.[4]

Trial Tr. at 33. Chin replied:

> I'm very interested in what you have to offer in the way of hot photos and magazines. I also have some (pre-teen and teen white and Oriental). Please send me a list of what you have (titles, descriptions or whatever you feel is appropriate). As soon as I receive it, (so that I can get a better idea of what I should send you to try to exchange for), I will send you a list of my material and we'll take it from there. Discretion is of the utmost importance.

Trial Tr. at 32.

When "Ted" wrote back describing his collection of child pornography, petitioner pursued the matter.

> [F]rom the description of your materials it sounds like we may have some common interests. My collection is nowhere as extensive as yours. I have a few issues of Lolita, including several of the special color issues. I also have a copy of a maga-

---

3. Although these advertisements were written by actual members of the club, pursuant to the undercover scheme, all responses were filtered through postal inspectors.

4. Club members in fact communicated in a simple code. For simplicity, the court reports the correspondence as "decoded." The court further finds it unnecessary to a resolution of the pending motion to cite to the cruder passages of the correspondence.

zine devoted to a single subject, very high quality.

And the magazines are listed Lolita number 8, 9, 35 and 39 and magazine Sweet Linda.

I am very interested in Orientals in cases where you could definitely tell they're under 14. Since my collection is so limited, would you be open to any sort of arrangement? (Renting? {I'd be willing to pay you a fee} Selling?) How did you obtain your materials? I'd love to know.

Trial Tr. at 34–35.

After several months, "Ted" responded, suggesting a "loan" arrangement. He offered two of his items, asking petitioner to send him the "Sweet Linda" magazine. Petitioner did not respond immediately for reasons he explained in his next letter.

This time it's my turn to apologize for not writing back sooner. I'm still trying to decide whether or not I want to go through with the arrangement that you had suggested. I am extremely cautious for two reasons. As you may have read in the last issue of CLC, there was a government sting operation a number of months ago (Far Eastern Trading). I had received the brochures and had even sent back a money order for one of the magazines. Of course I didn't receive anything. I was even naive enough to send a follow-up letter to Far Eastern to inquire about my order. Thank god I never got anything in the mail or I might have been in real hot water. After hearing about the number of first timers who were arrested I feel very fortunate.

Also, last Saturday on West 57th Street on Channel 2 there was a segment entitled Kiddie Porn. I was extremely worried about what was said on the show. The segment was about how the Postal Service was trying to stop the sending of child pornography through the mail. They showed actual files on people which included magazines and letters.... This really worries me. I'm wondering if any of our letters are being read by the Postal Service. If in fact they are, then I am very reluctant to do anything more than write to you at this point. I would like to try the arrangement that you had suggested but I want some time to think about it first. The risks, if what was said on the show was true, could be significant. In the meantime, I was wondering if you could do a couple of things for me. One, destroy all of my previous letters to you, (this one after you've read it), two, keep my address in a place separate from your literature, three, let me know if you are in any way a law enforcement officer, (this last one is to protect me in case I'm being entrapped). I assure you that I am not.

I hope you can understand why I feel this way. Believe me, I am *dying* to see the magazine that you mentioned, but I'm not sure that I'm ready to risk destroying my life at this point.

Please write back. Let me know your feelings on this matter. I hope that you don't mind being pen pals for the time being.

It sounds like you've been to the Far East in your travels. I am thinking of going to either Amsterdam, Bangkok or Manila in search of fun. Please let me know about your experiences and recommendations in any of those fun cities.

Trial Tr. 37–39 (emphasis in original).

In two response letters "Ted" echoed Chin's concerns. In the second letter he volunteered that he had an address in Bangkok where "Lolita material" could be obtained. He offered to share it with petitioner. Chin answered that he was still "a little bit paranoid," but definitely interested in the Bangkok material. "If possible, could you give me that address so that I could write directly?" Trial Tr. at 42. He further volunteered:

I am taking a trip to Amsterdam in about two weeks. Of course I will spend a considerable amount of time checking out the red light district. Let me know if you might want anything or if you have any contacts there that might be helpful in searching out Lolita material or even meeting them.

Trial Tr. at 42. "Ted" answered: "Yes, definitely bring something back for me. Either the most recent Lolita magazine available or

any eight millimeter film you think that I might like." Trial Tr. at 43.

Upon returning from Amsterdam in February 1989, Chin reported in detail on his efforts to obtain child pornography.

It turns out that Lolita porn was banned in Amsterdam three years ago, however the stores were still stocking them under the counter and showing them to customers upon request up to a year ago. Then, because of great pressure from the U.S. government even that was stopped....

Not all bad news though. I did find one dealer who did tell me that he still had some Lolita material from some years ago. I had to agree to buy at least four mags from him. He then closed the entire store and brought out a stack of about 30 magazines (because of the danger of police he said that this was the only way). I browsed through the entire stock (what a pleasure that was) and selected four. Getting the mags back to the U.S. was difficult. The dealer told me not to mail them back because U.S. Customs will check all packages from Amsterdam. Carrying them in luggage was also advised against, he said the safest way was to tape them to my body. It sure was uncomfortable....

As for films, the only thing that I was able to find was a video series of nudists.... I bought one and previewed it in Amsterdam, but for some strange reason I can't get it to work on my machine....

I'll be happy to trade with you. I am very interested in Orientals, any Lolita stuff....

I will send you stuff in a plain brown envelope with no return address. I would rather lose the material or have it confiscated than risk being caught. Please write back to let me know what you think. I am also excited to know what happens with your Bangkok connection.

Trial Tr. at 45–46.

"Ted" congratulated petitioner on making "it back from Europe with that extra weight on you." Trial Tr. at 47. He enclosed photocopies of one page from each of two child pornography magazines that he offered Chin in exchange for one of his "Lolita" magazines. Chin selected one of the magazines,

but instructed "Ted" not to send it until he had received the issue of "School Girls" that petitioner would mail "in a plain brown envelope without a return address ... about two days after I put this letter in the mail." Trial Tr. at 49. In early April 1989, the postal inspector did receive this magazine at his undercover post office box.

Chin was arrested by postal inspectors at his apartment in New York City on August 28, 1989. He admitted sending the "School Girls" magazine through the mail. When asked if he had any other child pornography, he initially stated that he had a number of magazines in a bank safety deposit box. He later denied this, saying that such magazines as he had were in his briefcase. Inside the briefcase, agents found three magazines depicting child pornography, including the one entitled "Sweet Linda." Chin told the agents he had thrown other child pornography magazines away when he grew tired of them.

A number of facts about petitioner's personal life were put before the jury. Between 1980 and 1987, Chin was engaged to be married. The couple's families were· close and everyone expected them to wed. Strains developed, however, and Chin's fiancee spent the time between November 1985 and November 1986 in Hong Kong. When the two finally wed in June 1987, the marriage lasted only three weeks because of sexual and communication problems. In July 1988, Chin's wife was diagnosed as manic depressive and prescribed lithium.

During this same time, Chin's father was quite ill with Parkinson's disease. In the summer of 1986 he had a number of strokes and underwent prostate surgery. Increasing family responsibilities fell on petitioner. During these years, Chin did see a therapist to help him deal with his various problems, but never discussed his fascination with child pornography.

Because Chin contended that he was entrapped by government agents to commit the charged crimes, the jury was duly instructed.

Now, the law does permit government agents to set a trap for an unwary criminally-minded person. So the issue in this case is not whether you approve or not of

the government's use of undercover agents or entities to detect unlawful activities. What the law does not permit is government agents to entrap an unwary innocent person.

Thus, a defendant may not be convicted of a crime if it was the government which gave the defendant the idea to commit the crime; if it was the government which also persuaded him to commit the crime; and if he was not ready and willing to commit the crime before the government officials or agents spoke or dealt with him.

On the other hand, if the defendant was ready and willing to violate the law and the government merely presented him with an opportunity to do so, that would not constitute entrapment, even though the opportunity arose in the context of an undercover or sting operation.

Your inquiry on this issue should first be to determine if there is evidence that a government agent, whether a law enforcement officer or an entity, took the first step that led to a criminal act. If you find that there was no such evidence, then there can be no entrapment and your inquiry on this defense would end there. If, however, you find some evidence that it was the government that initiated the criminal acts charged in the indictment, then it is the government that must prove to you beyond a reasonable doubt that the defendant was ready and willing before the inducement to commit the crime.

If you find beyond a reasonable doubt that the defendant was predisposed—that is, ready and willing—to commit the offense charged, and merely was awaiting a favorable opportunity to commit it, then you should find that the defendant was not the victim of entrapment.

On the other hand, if you have a reasonable doubt that the defendant would have committed the offenses charged without the government's inducements, then you must acquit the defendant.

Trial Tr. at 54–55.

After asking to hear the entrapment charge twice more in the course of their deliberations, the jury found defendant guilty of both counts.

On July 13, 1990, the court sentenced defendant to 52–weekends' incarceration, three-years' supervised release with a special condition of psychiatric counseling, a $15,000 fine, and a $100 special assessment. Chin was required to pay the costs of both his imprisonment and supervised release. A number of factors informed the court's sentencing decision. Among these were the seriousness of the criminal conduct and reservations about defendant's candor under oath. The court also considered the emotional problems that Chin was experiencing during the relevant period. Further, the court sought to fashion a sentence that permitted Chin to maintain gainful employment.

On appeal, Chin challenged his conviction on three grounds: (1) absent individualized suspicion of wrongdoing, the Postal Service's decision to target him in its undercover operation violated his constitutional right to privacy; (2) the conduct of postal inspectors during the investigation was so outrageous as to violate due process of law; and (3) evidence of Chin's Assent to Forfeiture of a magazine entitled "Seventeen's Teenager," which was addressed to Chin separate and apart from the undercover investigation and which was seized by Customs officials in 1986, was improperly admitted as evidence of pre-disposition. The Court of Appeals agreed that the Assent to Forfeiture should not have been received, but found the error harmless. *United States v. Chin,* 934 F.2d at 401. The other arguments were rejected as without merit. *Id.* at 397–401.

### Discussion

### I. *Procedural Posture of the Case*

■ Edward Chin contends that the government's proof at trial was legally insufficient to establish beyond a reasonable doubt that he was "disposed to commit the criminal act[s] charged prior to first being approached by Government agents." *Jacobson v. United States,* —— U.S. ——, 112 S.Ct. 1535, 1540, 118 L.Ed.2d 174 (1992).

■ Because petitioner did not raise this challenge on direct appeal, a serious question arises as to whether the claim should now be

entertained in a collateral motion absent a showing of good cause for the appellate omission and ensuing prejudice. *See Campino v. United States,* 968 F.2d 187, 190–91 (2d Cir. 1992); *accord United States v. Helmsley,* 985 F.2d 1202, 1206 (2d Cir.1993); *Laaman v. United States,* 973 F.2d 107, 114 n. 4 (2d Cir.1992). Chin submits that *Campino* and its progeny are not applicable to his case. He contends that his due process argument to the Court of Appeals necessarily encompassed a claim that the government had not met its burden of proving predisposition. This court disagrees.

As the Court of Appeals' opinion makes plain, Chin's predisposition had been disputed at trial. But the jury had decided against Chin on this issue, "and he has not pursued it on appeal." *United States v. Chin,* 934 F.2d at 398; *see* Def.'s Appellate Br. at 20 n. 17. Instead,

> [H]is claim now is that the techniques the Government employed in its undercover investigation were so outrageous as to violate the Due Process Clause, *regardless of whether he was predisposed to purchase and distribute child pornography.*

*United States v. Chin,* 934 F.2d at 398 (emphasis added). In short, the Court of Appeals was asked to reverse the conviction on due process grounds even assuming the correctness of the jury's finding as to predisposition.[5]

To the extent Chin may have sought to link his due process claim of "outrageousness" to the degree to which agent conduct had caused him to commit the charged crimes, the Circuit rejected such analysis as contrary to Supreme Court authority.

> In light of [*United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973)], then, whether investigative con-

duct violates a defendant's right to due process cannot depend on the degree to which the governmental action was responsible for inducing the defendant to break the law. Rather, the existence of a due process violation must turn on whether the governmental conduct, standing alone, is so offensive that it "shocks the conscience" . . . regardless of the extent to which it led the defendant to commit his crime.

*United States v. Chin,* 934 F.2d at 398 (citation omitted). Thus, Chin is simply wrong in his argument to this court that had the Second Circuit agreed with his due process argument it would necessarily have found that predisposition had not been established as a matter of law.

Petitioner's attempt to draw parallels between his predisposition claim before this court and his arguments to the Court of Appeals in fact depends upon a misreading of the Supreme Court's holding in *Jacobson v. United States.* Chin contends that

> [H]ad the Second Circuit agreed with Petitioner's argument that the Government acted improperly *because it had no reasonable basis to believe he was likely to commit a crime,* implicit in such a holding would be an acknowledgment that Petitioner was also entrapped, at least as that defense has been subsequently explained in *Jacobson,* since he was not shown to be "predisposed, prior to the Government's acts intended to create predisposition," to commit the crime.

Petitioner's Supplemental Mem. at 11 (quoting *Jacobson v. United States,* —— U.S. at ——, 112 S.Ct. at 1543) (emphasis added). The Second Circuit has recently rejected the argument that *Jacobson* requires the government be able to articulate a reasonable basis to believe a person is likely to commit a crime before it targets him for undercover

---

**5.** In his appellate brief, Chin's counsel had emphatically stated that the due process claim was "separate and distinct" from the entrapment defense pursued at trial.

> Mr. Chin does not concede that the defense of entrapment was not available to him. However, since the jury has already resolved that issue against him, and [since the Court of Appeals'] authority to review the jury's verdict is extremely limited, *he is not raising the entrapment issue here.*

Def.'s Appellate Br. at 20 n. 17 (emphasis added). Instead, the premise of his due process claim was "that in some instances police conduct may be so outrageous as to warrant dismissal of an indictment *regardless of whether defendant was predisposed to commit the crime alleged....* [This] is an issue of law which this court may review...." *Id.* (emphasis added).

investigation. *See United States v. Harvey,* 991 F.2d 981, 989–92 (2d Cir.1993).

In short, after carefully reviewing the briefs submitted on direct appeal and the Second Circuit's opinion, this court concludes that Chin did not therein raise a sufficiency challenge to the government's proof of pre-disposition.

This court is mindful that good cause excusing a failure to raise an argument on appeal may exist where a "claim is so novel that its legal basis is not reasonably available to counsel." *Reed v. Ross,* 468 U.S. 1, 16, 104 S.Ct. 2901, 2910, 82 L.Ed.2d 1 (1984); *accord Roman v. Abrams,* 822 F.2d 214, 223 (2d Cir.1987), *cert. denied,* 489 U.S. 1052, 109 S.Ct. 1311, 103 L.Ed.2d 580 (1989). This is not such a case. The *Jacobson* majority itself stated that it was not pronouncing any novel principle of entrapment law in requiring proof that a defendant was predisposed to commit the charged crime before he was approached by the government.

> The dissent is mistaken in claiming that this is an innovation in entrapment law.... Indeed, the proposition that the accused must be predisposed prior to contact with law enforcement officers is so firmly established that the Government conceded the point at oral argument....

*Jacobson v. United States,* —— U.S. at —— n. 2, 112 S.Ct. at 1541 n. 2.[6] In any event, Chin cannot claim novelty given that the court's charge on predisposition was entirely consistent with *Jacobson.* Specifically, the jury was told that a defendant could not be convicted unless he was "ready and willing to commit the crime *before the government officials or agents spoke or dealt with him.*" Certainly, no lawyer needed to read *Jacobson* to know that he was entitled to pursue on appeal a challenge to the sufficiency of the

government's evidence to prove the crime *as charged* by the court to the jury.

Even in the absence of any cause to excuse his procedural default, Chin contends that this court should address the merits of his claim. He submits that if, in fact, the government did fail to prove his predisposition beyond a reasonable doubt, it would mean he was actually innocent of the crime charged. Certainly, where "a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for procedural default." *Murray v. Carrier,* 477 U.S. 478, 496, 106 S.Ct. 2639, 2649, 91 L.Ed.2d 397 (1986); *accord Coleman v. Thompson,* —— U.S. ——, ——, 111 S.Ct. 2546, 2565, 115 L.Ed.2d 640 (1991); *Washington v. James,* 996 F.2d 1442, 1447 (2d Cir.1993), *Gonzalez v. Sullivan,* 934 F.2d 419, 422 (2d Cir.1991). In *United States v. Varley,* No. 91 Crim. 467, 1992 WL 159389, 1992 U.S.Dist. LEXIS 9509 (N.D.Ill. June 26, 1992), *reconsideration denied,* 1992 WL 220911, 1992 U.S.Dist. LEXIS 13030 (N.D.Ill. Aug. 31, 1992), the district court did hold that lack of predisposition equated with actual innocence and, therefore, entertained a *Jacobson*-based habeas challenge to a child pornography conviction despite petitioner's failure to raise the claim on direct appeal. This court need not determine whether every sufficiency challenge to proof of predisposition comes within the narrow class of cases appropriately reviewed on habeas corpus even in the face of procedural default. Assuming *arguendo* that this case warranted such review, the fact remains that sufficient evidence of predisposition was adduced to support the jury's verdict of guilty.

## II. *Sufficiency of the Evidence*

▮ A petitioner challenging the sufficiency of the evidence bears a heavy burden. He

---

**6.** If *Jacobson* did announce a "new rule" with respect to entrapment, this court would have to address the propriety of invoking it to support a collateral challenge to a conviction. *See·Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989); *accord Sawyer v. Smith,* 497 U.S. 227, 110 S.Ct. 2822, 111 L.Ed.2d 193 (1990); *United States v. Salerno,* 964 F.2d 172, 177–78 (2d Cir.1992). At least one federal court has held that a *Jacobson*-based claim is subject to *Teague* analysis. *See United States v. Varley,* No.

91 Crim. 467, 1992 WL 220911 *4–5, 1992 U.S.Dist. LEXIS 13030, at *14–17 (N.D.Ill. Aug. 31, 1992). The petitioner here contends otherwise and the United States does not rely on *Teague* in its response. Although this court recognizes that reasonable minds could differ, it accepts the statement of the majority in *Jacobson:* the rule is not a new one. In any event, as discussed in Part II of this opinion, petitioner's reliance on *Jacobson* does not alter the fact that his sufficiency challenge is without merit.

must demonstrate that no rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt. *E.g., Jackson v. Virginia,* 443 U.S. at 319, 99 S.Ct. at 2789. In considering the merits of such a claim, a court must view the evidence in the light most favorable to the prosecution, drawing all reasonable inferences and resolving all issues of credibility in its favor. *Id.; United States v. Weiss,* 930 F.2d at 191.

In this case, petitioner contends that no rational jury could have found him predisposed to commit the charged crimes before he was first approached by government agents. He relies on the Supreme Court's ruling in *Jacobson v. United States,* —— U.S. ——, 112 S.Ct. 1535, 118 L.Ed.2d 174 (1992).

Keith Jacobson was a 56–year old farmer living with his elderly father in Nebraska when, in 1985, he began to receive correspondence from various fictitious government organizations concerning pornography. The first letter, purportedly from the American Hedonist Society, simply solicited Jacobson's membership, explaining that the group consisted of individuals who believed they had a right to "read what we desire, ... discuss similar interests, ... [and] seek pleasure without restrictions being placed on us by outdated puritan morality." *Id.* at ——, 112 S.Ct. at 1538. Jacobson joined the club, indicating on a sexual attitude questionnaire that he enjoyed preteen sex but opposed pedophilia. Over a year later, in May 1986, Jacobson received a solicitation from a second fictitious organization, Midlands Data Research. As with American Hedonist, this group did not offer to send Jacobson any pornography. It simply asked him to respond if he believed in "the joys of sex and the complete awareness of those lusty and youthful lads and lasses of the neophite [sic] age." *Id.* Jacobson replied that he was interested in teenage sexuality and would like to receive more information. Instead, Jacobson was targeted by yet another fictitious entity, Heartland Institute for a New Tomorrow, which portrayed itself as a lobbying group seeking to repeal certain statutes dealing with sexual activities, including those that set an "age of consent." In response to the group's survey, Jacobson expressed an "above average, but not high" interest in preteen homosexuality. In further support of the group's efforts, he wrote, "[n]ot only sexual expression but freedom of the press is under attack. We must be ever vigilant to counter attack right wing fundamentalists who are determined to curtail our freedoms." *Id.*

The Heartland Institute offered to match group members with similar survey responses. Although Jacobson was provided with a list of potential "pen pals," he never initiated any correspondence. Instead, an undercover government agent began to write to him, discussing pornographic tapes. Although Jacobson responded by expressing his interest in males in their late teens and early twenties, he made no reference to child pornography.

In March 1987, some 26–months after Jacobson was contacted by the first fictitious government entity, he was sent a brochure by yet another fictitious company, Produit Outaouais, offering photographs of young boys engaged in sex. Jacobson placed an order but it was never filled. Thereafter, petitioner was sent a letter from a sixth fictitious entity, Far Eastern Trading Company, which sent him essentially the same letter as that sent to Edward Chin. When Jacobson responded, he was sent a catalog, from which he ordered a magazine. He was arrested after a controlled delivery. No other child pornography was found in his possession. The only other evidence linking Jacobson to child pornography concerned his placement of an order in 1984 for two "Bare Boys" magazines. Jacobson testified that he had expected these magazines to depict males 18 years or older, and was surprised when their subjects were preteen and teenage boys. In fact, at the relevant time, the receipt of these items was not illegal.[7]

---

7. Shipment through the mails or foreign commerce of sexually explicit depictions of children for noncommercial use did not become illegal until May 21, 1984. Child Protection Act of 1984, Pub.L. No. 98–292, 98 Stat. 204, 206; *Jacobson v. United States,* —— U.S. at —— – ——, 112 S.Ct. at 1541–42.

The Supreme Court ruled that these facts were insufficient as a matter of law to prove that Jacobson "possessed the requisite predisposition prior to the Government's investigation and that it existed independent of the Government's many and varied approaches...." *Id.* at ——, 112 S.Ct. at 1543. It held that the 1984 magazine order, at most, evidenced "a predisposition to view sexually-oriented photographs," particularly because this conduct was then legal and, thus, not proof that Jacobson "was predisposed to commit a criminal act." *Id.* at ——–——, 112 S.Ct. at 1541–42. Similarly, the Court found Jacobson's responses to the first four undercover communications to demonstrate only a "predisposition to view photographs of preteen sex and a willingness to promote a given agenda...." *Id.* at ——, 112 S.Ct. at 1542. Because no pornography was ordered as a result of these initial contacts, petitioner's responses did not support an inference that he was willing to "commit the crime of receiving child pornography through the mails." *Id.* The Court was critical of the government's lengthy and persistent campaign to pressure Jacobson into thinking that he had a right to read pornography and that doing so was "part of a fight against censorship and the infringement of individuals rights." *Id.* In short, this was not a case where a defendant promptly availed himself of an opportunity to order child pornography through the mails. *Id.* at ——, 112 S.Ct. at 1541. Jacobson was "ready and willing to commit the offense ... only after the Government had devoted 2½ years to convincing him that he had or should have the right to engage in the very behavior proscribed by law." *Id.* at ——, 112 S.Ct. at 1543.

Although the last letter sent to Jacobson—that from Far Eastern Trading—is virtually identical to the first one sent to Edward Chin, the similarities between the cases end there. First and foremost, the jury in Chin's case had evidence that petitioner was disposed *illegally* to transport child pornogra-

phy as early as July of 1984. This is when he admitted bringing the "Sweet Linda" magazine from Italy.[8] This evidence of virtually identical criminal conduct in July 1984 makes it impossible for this court to say as a matter of law that Chin was not predisposed to commit the charged crimes when he was first approached by government agents in 1986. *See United States v. Kussmaul,* 987 F.2d 345, 350 & n. 5 (6th Cir.1993) (admitted purchase of pornographic tapes through the mails in the past precluded defendant from claiming entrapment to deal in charged pornography).[9]

The court further notes that, unlike Jacobson's responses to undercover inquiries, which for over two years only expressed a "predisposition to view" child pornography, Chin's reflect an immediate eagerness to trade, loan, and order such merchandise. Certainly, as soon as he received Far Eastern's catalog, he ordered two magazines depicting child pornography. When he did not receive his order promptly, he sent follow-up letters. This sort of prompt response to a government invitation to purchase child pornography can support a jury finding of predisposition. *See United States v. Jacobson,* —— U.S. at ——, 112 S.Ct. at 1541; *accord United States v. Harvey,* 991 F.2d at 993.

Petitioner seeks to distinguish *Harvey* from his own case by noting that in *Harvey* it was the defendant, not the government, who first inquired as to the availability of child pornography. Moreover, the government's offer was not couched in terms critical of censorship efforts or suggestive of a right to view the materials, as it was in the Far Eastern letter. These distinctions do not, however, mark some bright line distinguishing between those circumstances under which a rational jury could find predisposition and those under which it could not. One letter criticizing government limits on pornographic material addressed to a man as highly educated as Edward Chin hardly amounts to what the Supreme Court viewed as the

---

**8.** Although Chin sought to recant this admission at trial, it was for the jury to assess his credibility. This court must assume that the issue was resolved in favor of the government.

**9.** In light of the Second Circuit's ruling on direct appeal, the court does not consider the magazine "Seventeen's Teenager" or Chin's Assent to Forfeiture as evidence of predisposition independent of contact by government agents.

two-year campaign of "pressure" exerted on Keith Jacobson. Moreover, unlike Jacobson, who testified that he eventually ordered a magazine because all the statements about censorship made him curious to see what was involved, Chin testified that he placed his order to obtain something "concrete" that would relate to his sexual fantasies. In essence, then, Chin admitted that he was a ready customer, not one induced by some campaign to protect first amendment rights.

Of course, Chin's predisposition to transport child pornography is also evidenced by his ready response to the Candy's Love Club questionnaire. Therein, he not only expressed his interest in child pornography; he stated that he had obtained such items in the past in Europe.[10] Moreover, Chin actively pursued child pornography advertised in the Candy's Love Club newsletters. Keith Jacobson, when afforded an opportunity to correspond with individuals with similar sexual tastes to his own, simply never followed up. Chin, by contrast, responded to ten advertisements, stating his interest in trading pornographic materials depicting heterosexual pre-teens and teenagers. Indeed, virtually every letter written by Chin to his undercover pen-pal "Ted" reflects either his prior possession of child pornography, his willingness to acquire such pornography abroad, or his willingness to send such pornography through the mails:

> I'm very interested in what you have to offer.... Please send me a list of what you have.... so that I can get a better idea of what I should send you to try to exchange for ... and we'll take it from there.
>
> ....
>
> My collection is nowhere as extensive as yours. I have a few issues of Lolita ... and magazine Sweet Linda.... Would you be open to any sort of arrangement? Renting? ... Selling?

Trial Tr. at 32, 34–35.

Although news reports about child pornography investigations would subsequently make Chin hesitant about dealing with the

undercover through the mail, it was he who independently planned a trip to Amsterdam to "search[ ] out Lolita material." In Amsterdam, it was he who sought out purveyors of child pornography until he found a vendor who sold him four magazines. Finally, it was petitioner who transported these into the United States, thereby committing the first of the charged crimes.

Of course, on his return, Chin contacted the undercover agent, reporting on his successful trip and immediately offering "to trade with you." When the agent agreed, sending photocopies of possible material to exchange, Chin mailed him a magazine depicting child pornography, thereby committing the second of the charged crimes.

The totality of this evidence amply supported a jury finding that Chin had transported child pornography internationally before he was ever contacted in any undercover investigation, and that he was at all times eager and enthusiastic to acquire more such material. It was, in short, his own predisposition to deal in child pornography that led to the commission of the charged crimes, not any importuning by the government.

### Conclusion

The evidence at trial was sufficient to establish Edward Chin's predisposition illegally to deal in child pornography before he was approached by any government agents or entities. The petition for a writ of habeas corpus is denied. Chin is granted a certificate of probable cause to appeal.

*SO ORDERED.*

---

**10.** At trial, Chin stated that his response to the latter question was not true. The court, however, is compelled to resolve all factual discrepancies favorably to the government. It assumes the jury did not credit the denial.