The PEOPLE of the State of
Colorado, Petitioner,

v.

William Charles SPROUSE, Respondent.

No. 98SC119.

Supreme Court of Colorado,
En Banc.

June 14, 1999.

Ken Salazar, Attorney General, Barbara McDonnell, Chief Deputy Attorney General, Michael E. McLachlan, Solicitor General, Peter J. Cannici, Assistant Attorney General, Appellate Division, Denver, Colorado, Attorneys for Petitioner.

David F. Vela, Colorado State Public Defender, Joan E. Mounteer, Deputy State Public Defender, Denver, Colorado, Attorneys for Respondent.

Justice RICE delivered the Opinion of the Court.

We granted certiorari in order to review *People v. Sprouse*, 962 P.2d 300 (Colo.App. 1997), in which the court of appeals reversed the trial court's denial of the defendant's motion for judgment of acquittal. The defendant appealed the judgment of conviction entered upon a jury verdict finding him guilty of criminal attempt to commit sexual assault on a child.[1] Specifically, the defendant asserted that he was entitled to a judgment of acquittal because the prosecution failed to carry its burden of proving beyond a reasonable doubt that he was not entrapped by the Arvada Police Department. The court of appeals agreed with the defendant, reversing the trial court and remanding with directions to vacate the judgment and enter a judgment of acquittal in its place. We conclude that the court of appeals erred in holding that the prosecution's evidence was insufficient as a matter of law to support a finding by the jury that the defendant was predisposed to commit attempted sexual assault on a child. Accordingly, we reverse and remand to that court with directions to consider the defendant's remaining arguments on appeal.

## I.

The defendant, William Charles Sprouse (Sprouse), was arrested in a Wheat Ridge motel at the conclusion of an Arvada Police Department "sting" operation designed to identify and investigate potential pedophiles.

Sprouse came under investigation by the Arvada Police Department's Crimes Against Children Unit in November 1994, when he placed a personal advertisement in a legal, sexually explicit publication seeking a "submissive female, ... pretty w/ slim build, 18–40 who craves father figure, spanking, kinky sex." This advertisement caught the attention of a detective who had been monitoring the paper for advertisements placed by individuals indicating an interest in exploiting children. As most sexually explicit publications do not permit individuals to openly state that they are interested in child pornography or other crimes against children, the detectives monitoring these advertisements routinely look for certain "code words" which, in their experience, are used by individuals interested in the sexual exploitation of children. These code words include several phrases used by Sprouse in his personal advertisement, such as "18–40," "slim build,"

---

1. *See* §§ 18–3–405(1) and 18–2–101(1), 6 C.R.S. (1998).

"youthful," and "father figure." Consequently, the detectives targeted Sprouse for further investigation.

In order to learn more about Sprouse, the detectives sent an application to his Butte, Montana home inviting him to join a fictitious pen-pal organization, known as "PRIVY." This organization offered to match applicants with other individuals who shared their sexual interests. Sprouse returned his PRIVY application in December 1994, indicating numerous sexual interests including: "Greek Culture," "Young Love," "Bondage and Discipline," "Teenagers," and "Masochism." Again, the detectives believed that these responses reflected an interest in child exploitation. Therefore, they sent Sprouse a pen-pal response from "Ann," a fictitious woman in her thirties. "Ann's" application indicated that she not only had sexual interests similar to Sprouse's, but that she was also interested in "Family Sex," "Sexual Awakenings," and "Sexual Education."

Sprouse promptly responded to "Ann," introducing himself and asking "Ann" for further explanation of the items checked on her application form. "Ann" then wrote to Sprouse, explaining that she marked "Young Love," "Sexual Awakenings," and "Sexual Education" on her application with her eleven year-old daughter, "Lisa," in mind. She stated that she was looking for some "T.L.C." for "Lisa," but that she was "very nervous about saying much more as not everyone in society believes as I do."

Sprouse wrote back to "Ann" immediately upon receiving her letter on December 20, 1994. In his letter, he stated:

As I see it you also want Lisa to learn about sex and all of its aspects.... I come to theese [sic] conclusions because you seem to mention that your main concern is Lisa. Also because you marked *"Young Love"* and *"Family Sex"* which also means to me that you are also interested in your own pertisapation [sic]. Which I wholey [sic] approve of. If this is what you want then I could very well be the man you are looking for.

Sprouse mailed the letter via Priority Mail and enclosed a money order for "Ann" so that she could afford to send her response to him via Priority Mail as well.

"Ann" wrote back to Sprouse on December 28, 1994. In response to Sprouse's questions regarding her own sexual interests, she stated that what she really wanted was a "special teacher" to give "Lisa" his "undivided and full T.L.C." She also indicated an interest in being present during the "lessons" and asked whether Sprouse had ever "trained" another child.

Sprouse responded in a letter dated December 30, 1994, which opened with the following passage:

I am interested ☺ so you may feel free to open yourself up to me. What we are talking about is against the Law [sic]. But I feel as you do that the time is right for Lisa to learn about sex. Ann and Lisa you can trust me to be discret [sic]. I am not a postal inspector [sic] or involved with the Law [sic] in any way.... What we are planing [sic] here is a very delicate thing and if I wasn't sure that I'm what you are looking for I wouldn't take the chance.

(Smiling face in original.) Sprouse also indicated that he had "trained" a fifteen year-old girl before and described the circumstances surrounding this encounter. Sprouse's letter contained a graphic description of the sexual acts which he intended to perform with "Lisa" as part of her training. Finally, Sprouse indicated that he wanted to "get started as soon as possible."

The pen-pal relationship progressed over the course of several months, during which the two exchanged a total of nineteen letters. During this time, the two discussed the specifics of "Lisa's" sexual training and made plans for Sprouse to travel to Colorado. In her letters, "Ann" repeatedly asked Sprouse general questions regarding the methods he would use to train "Lisa." Sprouse responded with graphic accounts of the sexual acts that he planned to engage in with her.

In one letter, "Ann" also informed him that "Lisa" was "so looking forward to meeting [him] and learning that she's getting hard to live with!" "Ann" .asked Sprouse to come to Colorado, as her car was not good enough to make the 800 mile drive to Montana. She also pressed Sprouse to tell her about videos

and books that she could show "Lisa" in order to prepare for his visit. Finally, "Ann" repeatedly thanked Sprouse for agreeing to sexually train "Lisa."

In a letter written in early February 1995, Sprouse told "Ann" and "Lisa" that "Lisa's" training "could take up to a month or mabey [sic] longer if she is hard to teach." He went on to state that "[a] crash course on the basics would take two weeks." Finally, in a February 15, 1995 letter to "Lisa," Sprouse wrote:

> Honey, if TLC is what you want I give you all that you deserve. I be [sic] very tender with you but I'll also teach you all of what you need to know. You will need to trust me and put your faith in me. Their [sic] are some things you will need to know that will be [awkward] for you at first. Please don't worrie [sic] about them I will show you how to be comfortable with them and you will recieve [sic] the most pleasurable time of your life.

Through these letters and a few phone calls, Sprouse and "Ann," portrayed by Arvada Police Officer Faith Forum, arranged for Sprouse to travel to Colorado for ten days at the end of May and the beginning of June 1995. Sprouse met Officer Forum at a motel in Wheat Ridge. The two had a brief conversation and Sprouse proceeded to the room where "Ann" informed him that "Lisa" would be waiting for him. Sprouse was arrested upon entering the room. After his arrest, Sprouse gave officers permission to search his automobile. In the trunk of his car officers found a box which contained numerous sexual aids and devices as well as a sexually explicit publication that Sprouse had purchased upon arriving in Denver.

Sprouse was charged with attempted sexual assault on a child. At the close of evidence, Sprouse moved for a judgment of acquittal, arguing that the prosecution did not present sufficient evidence to disprove his defense of entrapment beyond a reasonable doubt. Specifically, he claimed that the evidence was insufficient because the prosecution's only proof that he was predisposed to sexually assault children was collected after the Arvada Police Department's sting operation began. Sprouse claimed that this type of evidence was insufficient to prove that he was predisposed to committing this crime prior to his contact with the Arvada Police Department. The trial court denied Sprouse's motion, holding that the prosecution had presented "ample evidence to show that the defendant was not induced in this attempt but rather sought [the child sexual assault] as his own suggested act." The trial court further held that the prosecution had arguably demonstrated that the police simply provided Sprouse with an opportunity to commit the offense, rather than using methods which rose to the level of inducement.

The trial court instructed the jury regarding Sprouse's entrapment defense.[2] After deliberation, the jury found Sprouse guilty of attempting to sexually assault a child. The court sentenced him to three years in prison.

On appeal, Sprouse renewed his argument that the prosecution's evidence of his predisposition was insufficient as a matter of law because it was obtained after his initial contact with the Arvada Police Department. The court of appeals agreed, reversed Sprouse's conviction, and ordered entry of a judgment of acquittal on the charge. *See*

---

2. The court gave the pattern entrapment jury instruction, which is based upon our holding in *Evans v. People,* 706 P.2d 795 (Colo.1985). This instruction reads as follows:

It is an affirmative defense to the crime of Criminal Attempt Sexual Assault on a Child that the defendant engaged in the proscribed conduct because he was entrapped. The defendant was entrapped if: (1) the defendant is a person who, but for the inducement offered, would not have conceived of or engaged in conduct of the sort induced; (2) the defendant engaged in the proscribed conduct because he was induced to do so by a law enforcement official or other person acting under his di-

rection, seeking to obtain evidence for the purpose of prosecution, and not as a result of the defendant's own predisposition; (3) the methods used to obtain such evidence were such as to create a substantial risk that this particular defendant would engage in the sort of conduct induced; and (4) the methods used were more persuasive than merely affording the defendant an opportunity to commit an offense, even if such an opportunity was coupled with representations or inducements calculated to overcome the defendant's fear of detection.

The parties do not challenge the propriety of this instruction.

*Sprouse*, 962 P.2d at 307. In doing so, the court stated that "the prosecution did not prove that [Sprouse's] predisposition was independent and not the product of the attention that police had directed towards him since November of 1994." *Id.* at 306. The court rejected the prosecution's evidence taken from Sprouse's letters, stating that "[Sprouse's] subsequent response to ["Ann's"] request] is not enough to establish beyond a reasonable doubt that he was predisposed, prior to the government acts intended to create predisposition, to attempt sexual assault on a child." *Id.* The court further held that "[e]vidence that [Sprouse] was ready and willing to commit such an offense came only after police officers ... contacted him and expressed a desire to receive sexual 'training' for a minor from him." *Id.*

## II.

On petition to this court, the prosecution argues that the court of appeals erred in concluding that the evidence at trial did not support the jury's finding that Sprouse was not entrapped. The prosecution contends that the court of appeals applied an erroneous legal standard in reviewing the sufficiency of the evidence to support Sprouse's conviction. Specifically, the prosecution disputes the court of appeals' holding that evidence obtained after the government's initial contact with Sprouse is insufficient to demonstrate that he was predisposed to commit this crime. We agree with the prosecution that the court of appeals improperly restricted its review of the sufficiency of the prosecution's predisposition evidence to that evidence obtained prior to the initial governmental contact.

## A.

■ As the defense of entrapment is not of constitutional stature, states are free to define it as they choose. *See Bailey v. People*, 630 P.2d 1062, 1066 (Colo.1981).[3] In Colorado, use of the entrapment defense is governed by section 18–1–709, 6 C.R.S. (1998), to wit:

The commission of acts which would otherwise constitute an offense is not criminal if the defendant engaged in the proscribed conduct because he was induced to do so by a law enforcement official or other person acting under his direction, seeking to obtain evidence for the purpose of prosecution, and the methods used to obtain that evidence were such as to create a substantial risk that the acts would be committed by a person who, but for such inducement, would not have conceived of or engaged in conduct of the sort induced. Merely affording a person an opportunity to commit an offense is not entrapment even though representations or inducements calculated to overcome the offender's fear of detection are used.

■ Under section 18–1–710, 6 C.R.S. (1998), entrapment is an affirmative defense. Accordingly, once a defendant has presented some credible evidence on the issue, the prosecution must prove beyond a reasonable doubt that the defendant was not entrapped. *See Bailey*, 630 P.2d at 1065. Therefore, when the entrapment defense is raised, the jury must be convinced beyond a reasonable doubt that the defendant was predisposed to commit the crime in question before it enters a guilty verdict. *See id.* Moreover, the

---

**3.** It is important to distinguish between the statutory defense of entrapment and the constitutional defense of outrageous governmental conduct. The latter provides a mechanism by which this court may curtail overzealous police activity that we find shocking to the conscience. *See People v. Vandiver*, 191 Colo. 263, 268, 552 P.2d 6, 9 (1976) (recognizing that a defense of outrageous governmental conduct exists when conduct by officers violates fundamental standards of due process). In contrast, judicial pronouncements of law regarding the propriety of police conduct are not appropriate in the context of the entrapment defense, as this defense rests upon a determination of the defendant's state of mind, which

is a factual issue for the jury. *See, e.g., Bailey*, 630 P.2d at 1066 (noting that Colorado's subjective approach to entrapment sanctions police conduct without question so long as the police actions are directed at persons predisposed to commit the offense charged). In the instant case, Sprouse raised an outrageous governmental conduct defense at the trial court and to the court of appeals. In light of its reversal of Sprouse's conviction on the grounds of entrapment, the court of appeals did not address the outrageous governmental conduct claim. Therefore, we have directed the court of appeals to address that claim on remand.

prosecution must prove beyond a reasonable doubt that the defendant was disposed to commit the criminal act prior to first being approached by law enforcement agents. *See Jacobson v. United States,* 503 U.S. 540, 548–49, 112 S.Ct. 1535, 118 L.Ed.2d 174 (1992).

■ The entrapment statute creates a subjective test that focuses on the state of mind of a particular defendant, and does not set a general standard for police conduct. *See Vega v. People,* 893 P.2d 107, 118 (Colo. 1995). This does not mean that police conduct should be ignored, but rather that the existence of any predisposition on the part of the defendant must be determined first, then the extent of any such predisposition must be considered in relation to the character of the inducements. *See id.* Inducement does not become irrelevant to the entrapment inquiry, to be sure, because the stronger the inducement, the more likely that any resulting criminal conduct by the defendant occurred as the result of the inducement rather than of the defendant's own predisposition. *See United States v. Watson,* 489 F.2d 504, 511 (3d Cir.1973).

Depending upon the particular circumstances of the case, the prosecution may offer a wide variety of evidence and testimony in an attempt to demonstrate that a defendant was predisposed to commit a particular crime. *See* Paul Marcus, *The Entrapment Defense* § 4.14 (2d ed.1995). The most commonly invoked forms of proof include the following: the defendant's conduct in response to the government inducement, particularly whether he or she evidenced reluctance to commit the offense; the amount of persuasion the government was required to employ in order to overcome any reluctance; the nature of the defendant's ability to perform the illegal acts; the defendant's prior acts, including his or her criminal record; hearsay evidence of reputation; and the defendant's conduct during negotiations with the government agent. *See id.,* §§ 4.15–4.20; *see also United States v. McLernon,* 746 F.2d 1098, 1111 (6th Cir.1984). Courts and commentators have noted that of these types of evidence, the defendant's response to the inducement, that is, whether he or she demonstrates strong reluctance, mild reluctance,

indifference, or eagerness, is often the most persuasive evidence of his or her state of mind just prior to the governmental inducement. *See United States v. Kaminski,* 703 F.2d 1004, 1008–09 (7th Cir.1983); Kenneth M. Lord, *Entrapment and Due Process: Moving Toward a Dual System of Defenses,* 25 Fla. St. U.L.Rev. 463, 481 (1998).

■ A consideration of these common forms of proof demonstrates that, in the overwhelming number of cases, resolution of the entrapment defense is properly reserved for the jury, as predisposition frequently depends upon a fact-intensive credibility determination. *See* Marcus, *supra,* § 6.13. However, there are certain circumstances under which the trial court cannot allow the jury's conclusion to stand, because a conviction based upon a record lacking any relevant evidence is constitutionally infirm. *See Thompson v. Louisville,* 362 U.S. 199, 204, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960). Therefore, a judgment of acquittal must be entered where the evidence is insufficient to support the jury's verdict of guilty. *See People v. Gonzales,* 666 P.2d 123, 128 (Colo.1983).

#### B.

In the instant case, Sprouse argues that the court of appeals was correct in concluding that he was entitled to a judgment of acquittal because he was entrapped. Specifically, Sprouse claims that the court of appeals correctly held that the prosecution's evidence was insufficient as a matter of law to support a finding by the jury that he was predisposed to commit this crime beyond a reasonable doubt. The court of appeals' holding was based upon its conclusion that the prosecution's evidence taken from Sprouse's letters was insufficient to support a conclusion of predisposition, as it was obtained after the government suggested the commission of the crime to him. As we find no support for such a conclusion in law or public policy, we reverse.

The court of appeals' restriction on predisposition evidence is overbroad insofar as it would curtail the presentation of evidence, which, in fact, is highly relevant to the predisposition inquiry. For example, as dis-

cussed earlier, the enthusiasm with which a defendant responds to the government's suggestion to commit a crime is sometimes the most telling evidence of his or her state of mind just prior to being contacted by the government. A demonstrable lack of reluctance on the part of the defendant weighs heavily in favor of a finding that the defendant was predisposed to commit a crime, even though such evidence does not arise until *after* the government contacts the defendant and suggests the crime. *See Chin v. United States,* 833 F.Supp. 154, 163 (E.D.N.Y.1993). A defendant who readily responds to the mere suggestion of criminal activity by the government should not be shielded by a rule requiring that all evidence of predisposition be obtained prior to the government's contact, as it is often the case that the sole proof of predisposition consists of evidence of the defendant's response to the overtures of the government agents. *See id.* As one court noted, "[t]he application of the [pre-contact] rule … would provide an entrapment defense to every individual who establishes an unblemished personal record prior to being approached to commit a crime." *Harrison v. State,* 442 A.2d 1377, 1386 (Del.1982).

In support of its holding, the court of appeals cites *Jacobson v. United States,* 503 U.S. 540, 112 S.Ct. 1535, 118 L.Ed.2d 174 (1992) (finding entrapment as a matter of law where the government engaged in a two and one-half year mail campaign urging the defendant to exercise his First Amendment right by purchasing child pornography through the mail). The court of appeals suggests that *Jacobson* stands for the proposition that the prosecution's proof of predisposition must be established by evidence obtained prior to the government's initial contact with the defendant. *See Sprouse,* 962 P.2d at 306.

However, we find that the plain language of *Jacobson* does not support such a conclusion. The Court in *Jacobson,* after analyzing all of the evidence presented at trial, found that the proof of predisposition demonstrated only that the defendant had certain "generalized personal inclinations" and therefore, was not sufficient to prove that the defendant was

predisposed to commit the crime charged independent of governmental inducement. *Jacobson,* 503 U.S. at 550, 112 S.Ct. 1535. In *Jacobson,* the Court was addressing a persistent and overzealous governmental mail campaign that pursued a reluctant and unresponsive individual for a period of two and one-half years. It is a highly fact-intensive opinion from which no legal rule of general applicability emerges. Accordingly, we find that *Jacobson* does not support the court of appeals' opinion that evidence that Sprouse was ready and willing to commit sexual assault on a child was insufficient to support the jury's verdict because it was obtained after "Ann's" first letter requesting "sexual training" for her daughter. We further note that our interpretation of *Jacobson* comports with the interpretation of several federal circuit courts of appeal. *See, e.g., United States v. Thickstun,* 110 F.3d 1394 (9th Cir.1997); *United States v. Mitchell,* 67 F.3d 1248 (6th Cir.1995); *United States v. Kussmaul,* 987 F.2d 345 (6th Cir.1993).

■ Therefore, we hold that the court of appeals applied an erroneous legal standard in coming to its conclusion that the evidence at trial was insufficient to support Sprouse's conviction. We conclude that in reviewing the sufficiency of predisposition evidence, courts may rely upon evidence obtained after the government's initial contact with the defendant, so long as such evidence is relevant to the defendant's state of mind as it existed prior to the government's suggestion of the crime.

### C.

We now turn to an evaluation of the sufficiency of the evidence supporting the jury's verdict in this case. When assessing the sufficiency of the evidence in support of a guilty verdict, a reviewing court must determine whether any rational trier of fact might accept the evidence, taken as a whole and in the light most favorable to the prosecution, as sufficient to support a finding of the accused's guilt beyond a reasonable doubt. *See Kogan v. People,* 756 P.2d 945, 950 (Colo. 1988).

When ruling on a motion for judgment of acquittal, the trial court must consider both the prosecution and the defense evidence. *See id.* In performing this function, the court is bound by five well-established principles of law. *See id.* First, the court must give the prosecution the benefit of every reasonable inference, which might be fairly drawn from the evidence. Second, the determination of the credibility of witnesses is solely within the province of the jury. Third, the trial court may not serve as a thirteenth juror and determine what specific weight should be accorded to various pieces of evidence or by resolving conflicts in the evidence. Fourth, a modicum of relevant evidence will not rationally support a conviction beyond a reasonable doubt. Finally, verdicts in criminal cases may not be based on guessing, speculation, or conjecture. *See id.*

Our independent review of the evidence in this case convinces us that there is ample evidence in the record to support the jury's finding that Sprouse was predisposed to violate the law by attempting to commit sexual assault on a child. First, both Sprouse's initial personal advertisement and his responses on the PRIVY questionnaire arguably contained veiled terms, which suggested that he was interested in a sexual encounter with a child. For example, Sprouse requested a "submissive female ... who craves a father figure" and also admitted to having a sexual interest in "teenagers" and "young love."

Furthermore, Sprouse's response to "Ann's" ambiguous request for a man to be a "special teacher" for "Lisa" was immediate and enthusiastic. We find it significant that before "Ann" had even expressly stated that she was looking for an adult man to have sex with "Lisa," Sprouse assumed her meaning and replied that he "could very well be the man [she was] looking for." Furthermore, in his second letter to "Ann," Sprouse stated that "[w]hat we are talking about is against the Law [sic]. But I feel as you do that the time is right for Lisa to learn about sex." In fact, Sprouse indicated his eagerness to commit this crime in his second letter, in which he stated that "if I wasn't sure that I'm what you are looking for I wouldn't take the chance." Sprouse's enthusiastic responses indicate no hesitancy in his decision to undertake "Lisa's" sexual training. In fact, the government did not resort to any form of persuasion or pleading while acting as "Ann," as Sprouse agreed to the crime immediately after reading the hints and innuendo in "Ann's" first letter.

Moreover, the evidence tends to indicate that Sprouse was ready and able to commit the crime in question. In his second letter to "Ann," he indicated a desire to "get started as soon as possible." He also gave detailed descriptions of the sexual acts that he planned on using in "Lisa's" training, thus indicating that he had given the subject of "sexually training" a child a good deal of thought at some time in the past.

Finally, Sprouse candidly admitted in his letters that he had previously "sexually trained" a fifteen year-old girl. Sprouse gave a detailed description not only of the methods which he employed to "train" this fifteen-year-old, but also of the current status of his relationship with her. In the context of this case, this admission alone could lead a rational trier of fact to find that Sprouse was predisposed beyond a reasonable doubt, as it demonstrates that he had previously engaged in the identical form of criminal conduct at issue herein.

In sum, this evidence provides ample support for the jury's conclusion that Sprouse was predisposed to attempt to commit a sexual assault on a child, irrespective of the government inducement in this case.

### III.

On the record before us, we are satisfied that there is sufficient evidence from which a rational trier of fact could find that the defendant's guilt on the charge of attempted child sexual assault had been proven beyond a reasonable doubt. Accordingly, we reverse and remand to the court of appeals with directions to consider the defendant's remaining arguments on appeal.