MONTROSE VALLEY FUNERAL
HOME, INC., Plaintiff–
Appellant,

v.

Harry CRIPPIN and Greg Crippin,
Defendants–Appellees.

No. 90CA1844.

Colorado Court of Appeals,
Div. IV.

June 4, 1992.

Rehearing Denied July 2, 1992.

Coleman, Brown, Webster & Jouflas, Gregory Jouflas, Joseph Coleman, Grand Junction, for plaintiff-appellant.

Mathis and Masters, P.C., David L. Masters, Montrose, for defendants-appellees.

Opinion by Judge DUBOFSKY.

Plaintiff, Montrose Valley Funeral Home, Inc. (Funeral Home), appeals the order denying its motion to set aside the jury verdicts in favor of defendants, Harry and Kelly Crippin, on its interference with contractual relations claim. It appears that Greg Crippin, who was named as an appellee in this appeal, was dismissed from

the proceedings by the trial court. Funeral Home also appeals the trial court's order denying its request for attorney fees during a preliminary injunction hearing. We reverse both orders and remand for further proceedings.

Richard McIntire was the owner of Funeral Home until he sold it to the present owner, Frank Tucker, who initiated this lawsuit. In both 1982 and 1984, Funeral Home executed promissory notes with Montrose State Bank (Bank). Both loans had substantial balloon payments. In 1987, Funeral Home explored refinancing of the loans with Bank, but Bank refused to do so.

Funeral Home contends that, in 1987, the Crippins attempted to buy the business from the then owner, Richard McIntire; but McIntire refused to accept their offer. Funeral Home further claims that after McIntire's refusal, the Crippins contacted Bank and induced it not to extend its loans with Funeral Home. Funeral Home also alleges that the Crippins deposited a substantial sum of money in the Bank to induce Bank to stop loan negotiations with Funeral Home and to induce Bank into foreclosing on the loan and to sell the Funeral Home assets to the Crippins. Funeral Home maintains the business failed because Bank refused to renegotiate its loans.

After the interference with contractual relations trial was completed, the bailiff gave the jurors the transcriptions of the depositions of Jerry White, Gordon Wagner, Harry Crippin, and Richard McIntire. The depositions were placed on the table in the jury room.

Defendants obtained affidavits from all six jurors. All the affidavits state that the deposition transcripts of Wagner, White, and Crippin were not read or otherwise used by any member of the jury. The jury foreperson's affidavit, however, indicates that, during the course of deliberations, she opened the McIntire deposition and began to search for portions relating to McIntire giving financial information about Funeral Home to Harry Crippin.

The foreperson's affidavit also states that, after reading the deposition index in order to locate this information, she searched the deposition for it by looking for Harry Crippin's name. She then found three or four different passages which she believed might provide such information and read parts of these sections out loud to the other jurors. She quickly stopped such reading after she determined that none of the passages contained this information.

Her affidavit further indicates that, during the time she was reading the McIntire deposition aloud, the other jurors were deliberating and talking among themselves about the case. The foreperson also stated that she was uncertain whether the three or four passages in the McIntire deposition transcript which she read to the other jurors were also read in open court during the trial.

The affidavits of the other jury members either corroborate the foreperson's affidavit or are not inconsistent with it.

## I.

■ Funeral Home argues that the trial court committed reversible error in refusing to grant its new trial motion because four deposition transcripts were improperly provided by the bailiff to the jurors. Funeral Home also argues that the trial court erred in applying a "reasonable probability of prejudice" standard in deciding plaintiff's motion for a new trial based on the jury's improper access to the depositions. We agree.

In *Ravin v. Gambrell,* 788 P.2d 817 (Colo.1990), our supreme court adopted the "reasonable possibility of prejudice" standard to gauge juror misconduct in civil cases. We thus agree with Funeral Home's argument that the trial court erred in applying the incorrect legal standard in deciding the new trial motion.

■ Funeral Home next argues that since C.R.C.P. 47(m) explicitly prohibits depositions from being submitted to the jury, the trial court erred, as a matter of law, in refusing to grant a new trial. C.R.C.P. 47(m) states, in pertinent part:

Upon retiring for deliberation, the jury may take all papers, *except* pleadings, *depositions*, accounts or account books, which have been received in the case ... (emphasis added)

We disagree that the submission of deposition transcripts to the jury, which are not read or otherwise used by the jurors, as a matter of law, necessitates a new trial.

In deciding this *per se* claim of Funeral Home, it is important to note that here the affidavits of the jurors state that three of the depositions were never read. Without these juror affidavits demonstrating that three of the depositions were not read, it would be a more difficult question to determine if possession of the depositions, without precise information as to their use, by the jurors mandates reversal. *See People v. Montoya*, 773 P.2d 623 (Colo.App.1989).

Since, however, there is no contradictory evidence indicating these affidavits are incorrect, it would be exalting form over substance to find that the mistaken possession by jurors of depositions that were neither read nor otherwise used during the deliberative process requires reversal.

■■■ CRE 606(b), applicable to both civil and criminal cases, prohibits inquiry into the deliberative processes of jurors. But, a party alleging juror misconduct may introduce evidence to establish that external matters improperly influenced the jury verdict. *People v. Garcia*, 752 P.2d 570 (Colo. 1988). Furthermore, a responding party may also establish by affidavit what, if any, outside extraneous information was actually received by the jury. *See Destination Travel, Inc. v. McElhanon*, 799 P.2d 454 (Colo.App.1990). However, how the improperly received information was actually used by jurors in the deliberative process cannot be inquired into. *See People v. Collins*, 730 P.2d 293 (Colo.1986).

■ These principles are designed to effect the finality of jury verdicts as well as the sanctity of jury deliberations and to safeguard the privacy of jurors. *Ravin v. Gambrell, supra.* Nevertheless, as important as these concepts are, in cases in which the results of jury deliberations have been substantially undermined because of fundamental flaws in the deliberative process, courts must weigh the force of these policies against the overriding concern that parties to the judicial process be assured of a fair result. *Patterson v. Colorado*, 205 U.S. 454, 27 S.Ct. 556, 51 L.Ed. 879 (1907).

■ Funeral Home argues that the repetition of McIntire's court testimony through his deposition, coupled with the not admitted, extraneous, and prejudicial evidence in the deposition, requires a new trial. We agree.

The foreperson's affidavit indicates that she quickly read most, if not all, of McIntire's deposition in order to find certain material. Her affidavit also states she is not certain if the three or four passages she read aloud to the jury were duplicative of those previously read in court or constituted new material.

The deposition of McIntire consists of 149 pages, and approximately 45 of those pages were read into evidence. The information in the deposition transcript which was not read to the jury related to issues in the case and was arguably prejudicial to the Funeral Home's position. For example, there was evidence in the deposition, not admitted at trial, indicating that McIntire had serious drug problems and this was the reason the bank refused him credit. Furthermore, there was evidence indicating he misused prepaid trust money which, in turn, implied he was either dishonest or a poor businessman. There was also evidence in the deposition, not provided at trial, revealing personal and other financial areas of McIntire's life which could have caused the jury to discount Funeral Home's claim that the Crippins' activities caused the loss of financing.

Moreover, the juror reviewing the 45 pages in the deposition that were previously read at trial may have overemphasized that testimony with the jury. *See People v. Montoya, supra.*

In light of the numerous repetitious and extraneous matters in McIntire's deposition to which the jury was improperly exposed, we conclude that there is a reasonable pos-

sibility that the Funeral Home was prejudiced by the jurors' receipt and use of McIntire's deposition. *See Ravin v. Gambrell, supra.*

## II.

 Funeral Home next argues that the trial court erred in not awarding it attorney fees after determining that the Crippins' preliminary injunction motion and hearing was frivolous and groundless. We agree.

The Funeral Home had a prepayment plan for people who wanted to ensure the availability of Funeral Home services and other benefits when they died. The Crippins filed a counterclaim alleging that Funeral Home had misused money prepaid to it for services and benefits when people died. As part of their counterclaim, defendants filed a preliminary injunction action against Funeral Home to regain pre-payment funds paid by a person not a party to this action.

The trial court denied the preliminary injunction request and found it to be frivolous and groundless. However, because it determined that Funeral Home had failed to mitigate its costs and attorney fees, the trial court refused to award attorney fees relative to that claim.

The Funeral Home argues that, while this may be a basis to determine its attorney fees and costs were not reasonable, it cannot serve as a basis for a refusal to make any award. We agree that under § 13–17–102(6), C.R.S. (1987 Repl. Vol. 6A), if a claim lacks substantial justification, the court "shall" assess attorney fees. Thus, if, as here, a determination is made that an action lacks substantial justification, then an award of attorney fees is required. *Carnal v. Dan Coleman, Inc.*, 727 P.2d 412 (Colo.App.1986).

In making such an award, the court must apply the appropriate standards. *See Pedlow v. Stamp*, 776 P.2d 382 (Colo.1989); *Spensieri v. Farmers Alliance Mutual Insurance Co.*, 804 P.2d 268 (Colo.App.1990).

\* Sitting by assignment of the Chief Justice under provisions of the Colo. Const. art. VI, § 5(3),

Here, it does not appear from this record that the trial court provided a hearing on whether the injunction claim lacked substantial justification or as to the appropriate amount of attorney fees. If no hearing was provided on these issues, then it will be necessary to do so. *See Pedlow v. Stamp, supra.*

The trial court's order denying plaintiff's motion to set aside the verdicts because of juror misconduct is reversed, and the cause is remanded for new trial. Also, the trial court's order denying attorney fees to plaintiff in the preliminary injunction proceeding is reversed, and the cause is remanded on this issue for further determinations consistent with the views expressed in this opinion.

MARQUEZ, J., and HODGES,\* Justice, concur.