**The PEOPLE of the State of Colorado, Plaintiff–Appellee,**

v.

**Neoal G. HAYES, Defendant–Appellant.**

### No. 94CA0018.

Colorado Court of Appeals, Div. IV.

Dec. 7, 1995.

As Modified on Denial of Rehearing Jan. 25, 1996.

Certiorari Denied Sept. 9, 1996.

Gale A. Norton, Attorney General, Stephen K. ErkenBrack, Chief Deputy Attorney General, Timothy M. Tymkovich, Solicitor General, Robert Mark Russel, First Assistant Attorney General, Denver, for Plaintiff–Appellee.

Ellen Toomey, Brighton, for Defendant–Appellant.

Opinion by Judge KAPELKE.

Defendant, Neoal G. Hayes, appeals from the judgment of conviction entered upon jury verdicts finding him guilty of first degree and second degree assault. He also appeals his sentence. We affirm.

On January 18, 1993, Martin Luther King, Jr. Day, the victims, a young woman and her friend, had attended a celebration rally at the state capitol and had followed the crowd when it moved up the street. They observed an individual being assaulted by a group of people, and the first victim, the young woman, approached the group and attempted to break up the fight. One of the participants, later identified as defendant, punched her in the face twice.

After being struck, the first victim turned around and began walking away. Defendant then hit her again from behind, knocking her unconscious. As she lay on the ground, another youth jumped on her head.

When her friend, the second victim, tried to help her, a group of people punched and kicked him. Defendant joined this group and kicked the victim several times as he lay on the ground.

As a result of the assault, the first victim suffered severe injuries, including a broken

nose, lacerations on her face, and a hole in her lip. The second victim received contusions on his head, neck, and back. A cameraman at the scene filmed the assaults on both victims.

The prosecution charged defendant, who was seventeen at the time of the incident, with first degree assault, second degree assault, and ethnic intimidation. Thereafter, the prosecution filed a motion to transfer the case from juvenile court to district court in order to have defendant tried as an adult.

Before the transfer hearing, defendant filed a motion to disqualify the juvenile court judge on the basis that, because the judge was blind, he would be unable to view the videotape of the assaults and fairly decide the transfer motion. The court denied the motion for disqualification and conducted the transfer hearing with the aid of a narrator who described the contents of the videotape. At the conclusion of the hearing, the juvenile court waived its jurisdiction and transferred the case to district court.

In district court, a jury convicted defendant of first and second degree assault, but acquitted him of ethnic intimidation.

The trial court sentenced defendant to consecutive terms of sixteen years for the first degree assault and eight years for second degree assault.

## I.

Defendant first contends that the juvenile court judge erred in failing to disqualify himself by reason of his blindness. We disagree.

There is no suggestion that the juvenile court judge was biased or prejudiced, and the disqualification was not sought on that basis. The motion for disqualification was therefore not governed by either § 16–6–201, C.R.S. (1986 Repl.Vol. 8B) or Crim.P. 21, and the case law interpreting and applying those provisions provides virtually no helpful guidance for determination of this issue.

Both parties, in their briefs, have referred us to cases involving the disqualification of jurors by reason of physical disabilities. We agree that these cases, together with cases from other jurisdictions involving judges with disabilities, are instructive.

Defendant relies on *People v. Trevino,* 826 P.2d 399 (Colo.App.1991), in which a division of this court held that a defendant's right to a jury trial had been violated because one of the jurors, who was hearing-impaired, had not worn her hearing aid during the second day of a two-day trial. There, the division concluded that the juror had been unable to hear material testimony or to participate in meaningful discussions during the deliberation phase of the trial.

Unlike the juror in *Trevino,* however, who had acknowledged having missed portions of the trial as a result of her disability, the juvenile court judge here took substantial steps to ensure that he was fully aware of the contents of the videotape.

■ Recognizing the problem presented, and upon the recommendation of the guardian ad litem, the judge enlisted the aid of a reader for the blind to describe to him the events portrayed on the videotape. The individual selected to provide the description reviewed the five minute videotape for four hours and prepared a written report of its contents. He then described the contents, while the videotape was being played, during the transfer hearing. The prosecution conducted a detailed examination of the narrator during which defense counsel was given the opportunity to correct any errors or comment on any omissions. Defense counsel then cross-examined the narrator.

Significantly, defendant has not suggested in this appeal that the contents of the video were not fully and accurately described by the narrator or that he was denied the opportunity to challenge the completeness or accuracy of the description. Instead, he takes the position that the narration could not serve as a substitute for an actual viewing of the videotape by the juvenile court judge.

■ The overall issue is whether, because of the judge's disability, defendant was denied a fair hearing in violation of his due process rights. *See People v. Caldwell,* 159 Misc.2d 190, 603 N.Y.S.2d 713 (Crim.Ct. 1993).

In *People v. Brown*, 62 N.Y.2d 743, 476 N.Y.S.2d 823, 465 N.E.2d 362 (1984), relied upon by defendant here, the New York Court of Appeals held that a blind judge should have recused himself from presiding at a hearing in which, because of his inability to see, he could not evaluate a photograph of a contested line-up. However, there is no indication in that opinion as to whether there had been an attempt to accommodate the judge's sight impairment.

In a later decision, the New York Court of Appeals adopted a more flexible approach and recognized that there may be safeguards that will protect a defendant's right to a fair trial and at the same time render disqualification unnecessary. Thus, in *People v. Guzman*, 76 N.Y.2d 1, 556 N.Y.S.2d 7, 555 N.E.2d 259 (1990), the court held that a hearing-impaired person was not, by reason of that impairment, automatically disqualified from service as a juror. The juror had been aided by a signing interpreter, and the trial court held that this accommodation protected the defendant's right to a fair trial.

In *People v. Caldwell, supra*, the court stated that the determination whether a blind juror should be disqualified is one which must be made according to the circumstances of each case, and taking into account reasonable accommodations which can be made. Thus, for example, documentary evidence can be read into the record and physical evidence not requiring actual observation can be described. *People v. Caldwell, supra; Galloway v. Superior Court*, 816 F.Supp. 12 (D.D.C.1993).

▪ As the court recognized in *People v. Guzman, supra*, the factfinder—be it judge or juror—must at a minimum be able to understand all of the evidence presented and evaluate that evidence in a rational manner. In addition, any accommodation to allow the judge or juror to fulfill these duties must be reasonable and not itself interfere with defendant's fundamental trial rights.

▪ Turning to this case, we note that a transfer hearing serves two purposes. The first is to determine whether there is probable cause to believe that the juvenile has committed the act for which transfer is sought. Section 19–2–806(2)(a), C.R.S. (1995 Cum Supp.). This portion of the hearing is equivalent to a preliminary hearing, and case law on preliminary hearings applies to this phase. *People v. Juvenile Court*, 813 P.2d 326 (Colo.1991).

▪ The probable cause portion of defendant's transfer hearing was not affected by the judge's blindness. The videotape evidence was cumulative for this portion as defendant stipulated to his identity as the person who committed the assaults, and both victims testified concerning the extent of their injuries. Moreover, issues relating to a court's factual determination of probable cause are ordinarily rendered moot by a jury's guilty verdict. *Kuypers v. District Court*, 188 Colo. 332, 534 P.2d 1204 (1975).

In the second or social phase of a transfer hearing, the court must determine whether the interests of the juvenile or the community would be better served by the juvenile court waiving its jurisdiction and transferring the case to district court. Section 19–2–806(2)(b), C.R.S. (1995 Cum.Supp.).

With respect to defendant, the juvenile court had to consider: (1) the seriousness of the offenses and whether protection of the community required isolation of defendant beyond that afforded by juvenile facilities; (2) whether the offenses were committed in an aggressive, violent, premeditated or willful manner; (3) whether the offenses were against persons or property; (4) defendant's maturity; (5) his record and history; (6) the likelihood of rehabilitation; (7) the interest of the community in imposition of punishment commensurate with the gravity of the offense; (8) the impact of the offenses on the victims; and (9) the fact that defendant was sixteen or older at the time of the offenses and that the offenses would constitute acts of violence under § 16–11–309, C.R.S. (1986 Repl.Vol. 8B), if committed by an adult. Section 19–3–108(2)(b), C.R.S. (1986 Repl.Vol. 8B).

The videotape here was relevant to several factors the court was required to consider in the social phase of the hearing. Nevertheless, we conclude that the detailed narration of the contents of the tape, coupled with the

opportunity afforded the defendant to add to or object to the narration and to cross-examine the narrator, was an appropriate accommodation and one which ensured defendant of a fair hearing and of a decision based on a rational evaluation of the actual evidence presented. *See People v. Guzman, supra.*

In addition, although defendant now challenges the qualifications of the narrator, he did not do so in the trial court, and he has demonstrated no prejudice with respect to either the completeness or the accuracy of the description of the content of the videotape.

Hence, we perceive no error in the judge's refusal to disqualify himself from conducting the transfer hearing.

## II.

Defendant next asserts that the evidence was insufficient to support his convictions for first and second degree assault. Again, we disagree.

Initially, we note that when the sufficiency of the evidence is challenged, we must determine whether the evidence, when viewed as a whole and in the light most favorable to the prosecution, is substantial and sufficient to support the conclusion by a reasonable person that defendant is guilty of the crime charged beyond a reasonable doubt. The prosecution must be given the benefit of every reasonable inference which could be drawn from the evidence. *Kogan v. People,* 756 P.2d 945 (Colo.1988).

### A.

We disagree with defendant that the prosecutor engaged in misconduct by proceeding under the theory that defendant's fist with the rings he was wearing constituted a deadly weapon.

Any object, including a fist, can be a deadly weapon if it is used or intended to be used in a manner capable of producing death or serious bodily injury. *People v. Ross,* 831 P.2d 1310 (Colo.1992). *See also* § 18–1–901(3)(e), C.R.S. (1986 Repl.Vol. 8B). In order to sustain a conviction for first degree assault, however, the prosecution

must prove that the deadly weapon actually caused serious bodily injury. *People v. Mozee,* 723 P.2d 117 (Colo.1986).

Defendant contends that the prosecution's theory that his fist with rings caused serious bodily harm was not supported by the evidence because the rings tested negative for the presence of soft tissue. He argues that the prosecutor engaged in misconduct by proceeding under this theory with knowledge that a lab report evinced these results.

Although the lab results were disclosed to defendant, he did not introduce the lab report into evidence, nor did he call as a witness the analyst who conducted the test. Thus, the record does not disclose the actual lab results.

Moreover, there was ample testimonial support for the prosecution's theory. A medical expert testified that defendant's rings could have caused the tearing of the victim's lip.

Under the circumstances, we reject defendant's contention that the prosecutor engaged in misconduct.

### B.

We are also not persuaded that the evidence was insufficient to show that defendant caused serious bodily injury to the victim.

Serious bodily injury is defined as bodily injury which:

[E]ither at the time of the actual injury or at a later time, involves a substantial risk of death, *a substantial risk of serious permanent disfigurement,* a substantial risk of protracted loss or impairment of the function of any part or organ of the body, or *breaks,* fractures or burns of the second or third degree.

Section 18–1–901(3)(p), C.R.S. (1995 Cum. Supp.) (emphasis added).

Although defendant admitted at trial that he punched the first victim and knocked her unconscious, he asserts that the prosecution failed to prove beyond a reasonable doubt that his punches caused the victim's injuries because the evidence revealed that another

youth jumped on the victim's head while she lay on the ground.

Contrary to defendant's assertions, however, there was substantial evidence that his blows caused serious bodily harm to the victim. Such evidence included: testimony by the victim that, as a result of defendant's punches, she felt blood running into her mouth; testimony by a medical expert that the victim's nose could have been broken when defendant punched her or when she fell to the pavement as a result of being knocked unconscious; and testimony by another expert that the hole in the victim's lip was more likely caused by defendant's rings than it was by someone jumping on her head while she lay on the ground. A physician also opined that the hole in the victim's lip could cause serious permanent disfigurement.

We therefore conclude that there was sufficient evidence in the record to support defendant's conviction for first degree assault.

### C.

Defendant further contends that his feet could not have been deadly weapons.

As previously noted, our supreme court held in *People v. Ross, supra,* that any object can be a deadly weapon if used in a manner capable of producing death or serious bodily injury.

At trial, defendant admitted that he kicked the second victim as he lay on the street. The second victim testified at trial that defendant kicked him in the head as well as in the chest and back. Such blows could certainly cause serious bodily injury. While there was conflicting testimony, it is the jury's role, not ours, to decide issues of credibility and the appropriate weight to be given to a witness' testimony. *People v. Quick,* 713 P.2d 1282 (Colo.1986).

We conclude that there was sufficient evidence to support defendant's conviction for second degree assault.

### III.

Defendant next contends that the trial court erred in denying defendant's motion for a new trial based on juror misconduct. We perceive no error.

When evaluating a claim of juror misconduct, the trial court should determine whether there is a reasonable possibility that the verdict was tainted by the introduction of outside information into the deliberations. In addition, a defendant must show that he or she was prejudiced by the misconduct. The trial court's determination should not be reversed absent an abuse of discretion. *People v. Key,* 851 P.2d 228 (Colo.App.1992).

### A.

The day after the jury returned its verdict, a local newspaper published an article stating that, during the trial, one of the jurors had recognized the defendant as someone who frequented her neighborhood and harassed people. The juror allegedly told a reporter that the defendant was generally considered to be a "racist" and that a lot of people were afraid of him. The article indicated that the juror recognized the defendant only after she was already seated on the jury and that she became certain of his identity when she saw the videotape of the assaults.

Defendant subsequently filed a motion for a new trial based on juror misconduct. The court held a hearing on the motion during which the juror in question testified. The reporter did not testify. The court ultimately found that there was no possibility that the juror's recognition of defendant affected the verdict.

There is record support for the trial court's finding. The juror testified that it was only *after* the verdict had been reached, while the foreman was rereading the verdict form and she was putting certain physical evidence, defendant's rings, back into a box, that she realized that she had previously seen the defendant. She also testified that she said nothing about it to the other jurors until after the verdict had been announced and the jury discharged.

The court found the juror's testimony to be credible, noting that defendant's appearance had changed dramatically between the time the juror had first seen him and the time of

trial. The record supports the court's ruling in this regard.

### B.

■ As for defendant's additional contention that he should be granted a new trial because another juror fell asleep during testimony by a medical expert, we note that the record does not reflect that the juror actually fell asleep, but merely that she was once admonished by the judge for having trouble keeping her eyes open.

We thus perceive no error in the denial of defendant's motion for a new trial.

### IV.

Finally, defendant asserts that the trial court abused its discretion in sentencing him to twenty-four years imprisonment. He further argues that his sentence is constitutionally disproportionate and that he was denied equal protection of the law because his co-defendant received a lesser sentence. We are not persuaded.

### A.

Defendant committed both assaults with deadly weapons and was therefore subject to enhanced penalties under the statute governing sentencing for crimes of violence. In addition, he was convicted of two separate crimes of violence arising out of the same incident, requiring the court to sentence him to consecutive rather than concurrent terms. See § 16–11–309(1)(a), C.R.S. (1995 Cum. Supp.).

The statutory sentencing range applicable to a first degree assault committed with a deadly weapon is ten to thirty-two years. See § 18–3–202(2)(c), C.R.S. (1995 Cum. Supp.); §§ 16–11–309(1)(a), 16–11–309(2)(a)(I)(A) and 16–11–309(2)(a)(II)(C), C.R.S. (1995 Cum.Supp.); § 18–1–105(1)(a)(IV), C.R.S. (1995 Cum.Supp.); and § 18–3–202(2)(b), C.R.S. (1986 Repl.Vol. 8B). The court sentenced defendant to sixteen years.

The statutory sentencing range applicable to a second degree assault when that assault is committed with a deadly weapon is five to sixteen years. See § 18–3–203(2)(b), C.R.S. (1986 Repl.Vol. 8B); § 18–3–203(2)(c), C.R.S. (1995 Cum Sup.); § 16–11–309(1)(a), C.R.S. (1995 Cum.Supp.); and § 18–1–105(1)(a)(IV), C.R.S. (1995 Cum.Supp.). The court sentenced defendant to eight years.

■ In sentencing the defendant, the trial court found that defendant had a propensity for violence, a history of gang activity, an absence of genuine remorse, and an attitude that the whole trial was a "big joke." These factors support the sentence determined by the court.

We therefore hold that the trial court did not abuse its discretion.

### B.

We also disagree with defendant's contention that his sentence was disproportionate to his crimes.

■ In *Solem v. Helm*, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), the United States Supreme Court held that the Eighth Amendment, which prohibits the imposition of cruel and unusual punishment, also prohibits the imposition of a sentence that is disproportionate to the crime committed.

■ The *Solem* Court set forth a three-step procedure for a court to follow when engaging in proportionality review. First, the court should consider the gravity of the offense versus the harshness of the penalty. Secondly, it should consider the sentences imposed on other defendants in the same jurisdiction. Finally, the reviewing court should look at the sentences imposed for the commission of the same crime in other jurisdictions.

■ Proportionality review should be undertaken separately for each sentence imposed, even if the sentences are to be served consecutively. *People v. Cabral*, 878 P.2d 1 (Colo.App.1993).

■ In non-habitual criminal cases, a reviewing court need not engage in intra or inter-jurisdictional analysis unless a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality. *Harmelin v. Mich-*

*igan,* 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991); *People v. Smith,* 848 P.2d 365 (Colo.1993).

■ Here, defendant was convicted of first and second degree assault, very serious crimes. In addition, his crimes were violent ones. This factor has always been important in determining whether a defendant's sentence is disproportionate. *See People v. Gaskins,* 825 P.2d 30 (Colo.1992). Moreover, the trial court did not sentence defendant to the maximum terms under the guidelines, but instead sentenced him to terms in the midrange of permissible sentencing.

We thus conclude that, under a threshold comparison, defendant's sentences were not disproportionate to his crimes.

### C.

Finally, we reject defendant's contention that he was denied equal protection of the law under the Fourteenth Amendment because his co-defendant received a lesser sentence.

■ By its nature, sentencing is individualized, and there is no rule that co-defendants must receive equal sentences. The failure to impose equal sentences on co-defendants is not a violation of the equal protection clause. *People v. Bruebaker,* 189 Colo. 219, 539 P.2d 1277 (1975). This is especially so when, as here, the co-defendant was tried and adjudicated as a juvenile.

Therefore, the sentence imposed by the trial court did not deny defendant equal protection.

The judgment and sentence are affirmed.

NEY and TAUBMAN, JJ., concur.