**The PEOPLE of the State of Colorado,
Plaintiff–Appellee,**

v.

**Deborah L. WADLE, Defendant–
Appellant.**

No. 01CA1484.

Colorado Court of Appeals,
Div. V.

Jan. 30, 2003.

Rehearing Denied April 24, 2003.

Certiorari Granted Oct. 6, 2003.

bleeding under the membrane that lines the skull. A pediatric ophthalmologist observed retinal hemorrhaging in the victim's eyes, and based on these observations, doctors concluded he suffered from shaken baby syndrome.

Three days later, the victim was determined to be brain dead. He was removed from life support and died. An autopsy confirmed the subdural hematoma and retinal hemorrhaging and also showed diffuse axonal injury, the disruption and shearing of nerves in the brain.

Defendant was charged with first degree murder, § 18–3–102(1)(f), C.R.S.2002, and child abuse resulting in death, § 18–6–401(7)(a)(I), C.R.S.2002. At her first trial, she was acquitted of murder, but the jury could not reach a verdict on the child abuse charge. At the second trial, defendant was convicted of child abuse resulting in death.

Ken Salazar, Attorney General, Catherine P. Adkisson, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

Dennis W. Hartley, P.C., Dennis W. Hartley, Colorado Springs, Colorado; Jean E. Dubofsky, P.C., Jean E. Dubofsky, Boulder, Colorado; Burke & Neuwirth P.C., Dean S. Neuwirth, Denver, Colorado, for Defendant–Appellant.

Opinion by Judge ROTHENBERG.

Defendant, Deborah L. Wadle, appeals the judgment of conviction entered on a jury verdict finding her guilty of child abuse resulting in death. Because we conclude there was sufficient evidence to support defendant's conviction, we reject defendant's contention that she is entitled to acquittal as a matter of law. However, we reverse the trial court's order denying defendant's motion for new trial based on juror misconduct and remand for a new trial.

## I.

Defendant was the stepgrandmother of the victim, a four-month-old infant male. At the request of the victim's mother, defendant agreed to babysit the victim. She picked up the victim and took him to her apartment. About one hour later, she called 911 and reported that the victim had stopped breathing.

When paramedics arrived, the victim was blue from lack of oxygen. After clearing an airway and stabilizing the victim, paramedics transported him to the hospital where a CAT scan showed signs of a subdural hematoma,

## II.

Defendant first contends there was insufficient evidence to support her conviction and she is therefore entitled to acquittal as a matter of law. We disagree.

When assessing the sufficiency of the evidence, the reviewing court must determine whether any rational trier of fact could accept the evidence, taken as a whole and in the light most favorable to the People, as sufficient to support a finding of guilt beyond a reasonable doubt. *People v. Sprouse*, 983 P.2d 771 (Colo.1999).

It is the fact finder's function to consider and determine what weight should be given to all parts of the evidence and to resolve conflicts, inconsistencies, and disputes in the evidence. *Kogan v. People*, 756 P.2d 945 (Colo.1988). We may not disturb the jury's determination on issues of credibility and weight unless the evidence is legally insufficient to support a finding of guilt beyond a reasonable doubt. *People v. Brassfield*, 652 P.2d 588 (Colo.1982).

The issue here was whether the victim died from having been violently shaken or from nontraumatic causes. Numerous experts testified for each side, and medical

testimony interpreting the same physical evidence was offered to support both theories. The verdict in large part depended on the weight given each side's expert testimony.

According to the People's evidence, an autopsy of the victim revealed a subdural hematoma, retinal hemorrhaging, and diffuse axonal injury. There was expert medical testimony that the coincidence of these conditions is consistent with shaken baby syndrome and that the victim's death was not attributable to other causes. There was also testimony that the victim's injuries were sustained while he was in defendant's care.

Defendant called a number of experts who testified that the victim's death was not caused by trauma. A pediatric neurologist testified that the victim had a preexisting brain anomaly that may have caused his brain to seize, and two other specialists testified that the victim's CAT scan was consistent with cerebral venous thrombosis, or clotting of veins in the brain. Another expert testified that the victim's death was caused by the rebleeding of chronic subdural hematomas.

Defendant relies on *Solis v. People,* 175 Colo. 127, 485 P.2d 903 (1971), and *Stevenson v. People,* 148 Colo. 538, 367 P.2d 339 (1961), for the proposition that evidence equally consistent with a hypothesis of innocence as with that of guilt is insufficient to support a criminal conviction. She maintains that because the medical evidence presented at trial is as consistent with a natural cause of death as with death from shaking, it was insufficient to support a finding of guilt beyond a reasonable doubt. We are not persuaded.

The standard set forth in these decisions has been modified by later decisions. *See People v. Sprouse, supra.* Also, *Solis* and *Stevenson* are factually distinguishable. In *Solis,* the supreme court concluded the prosecution's only evidence, fingerprints found in a publicly accessible area, left too much to speculation and was therefore insufficient to support the defendant's burglary conviction. In *Stevenson,* another burglary case, the supreme court concluded the circumstantial evidence that the defendant was a friend of the person in whose house stolen goods were found was insufficient to establish guilt beyond a reasonable doubt.

Here, the cause of death was sharply disputed, and there was considerable evidence presented by both sides. The issue was not a paucity of evidence, but conflicting interpretations of the same evidence by the numerous experts. We therefore conclude the evidence, viewed in the light most favorable to the prosecution, was sufficient for the jury to have found that defendant committed child abuse resulting in death.

### III.

Defendant next contends the trial court erred in denying her motion for new trial based on jury misconduct. She contends there is a reasonable possibility that information obtained from the Internet by a juror, in violation of the trial court's order, improperly exposed the jury to extraneous information and tainted the verdict. We agree and remand for a new trial.

### A. Standard of Review

■ Rulings on motions for new trial are generally reviewed for abuse of discretion, *see People v. McNeely,* 68 P.3d 540, 2002 WL 31600819 (Colo.App. No. 00CA1187, Nov. 21, 2002), and recent decisions by divisions of this court have applied this standard to motions for new trial based on jury misconduct. *See People v. Sherman,* 45 P.3d 774 (Colo. App.2001); *People v. Hayes,* 923 P.2d 221 (Colo.App.1995); *People v. Fox,* 862 P.2d 1000 (Colo.App.1993); *People v. Moore,* 701 P.2d 1249 (Colo.App.1985); *People v. Key,* 851 P.2d 228 (Colo.App.1992), *rev'd on other grounds,* 865 P.2d 822 (Colo.1994).

However, after tracing the history of cases that have considered motions for new trial based on jury misconduct, including Colorado Supreme Court decisions from *Butters v. Wann,* 147 Colo. 352, 363 P.2d 494 (1961), to the present, defendant maintains that divisions of this court recently have applied an incorrect standard of review. Defendant contends the trial court's conclusion is a matter of law that should be reviewed de novo.

■ While we acknowledge there has been some confusion and inconsistency on this is-

sue, we conclude that under *Butters* and *Wiser v. People,* 732 P.2d 1139 (Colo.1987), we are required to treat the issue as a mixed question of law and fact, applying the normal deferential standard to the trial court's factual findings, but reviewing de novo the trial court's conclusions of law. *See People v. Matheny,* 46 P.3d 453 (Colo.2002).

*Butters* was a wrongful death action resulting from an automobile accident. During trial, one of the jurors conducted an independent investigation, later explaining that she was "just curious." *Butters v. Wann, supra,* 147 Colo. at 356, 363 P.2d at 496. The juror learned, among other things, the amount the decedent drank and the fact that his driver's license had been revoked.

The supreme court ordered a new trial, concluding the juror had engaged in gross misconduct because "in total and deliberate disregard of the court's instructions, [the juror] made an independent investigation into matters not permitted to be inquired into at the trial." *Butters v. Wann, supra,* 147 Colo. at 356, 363 P.2d at 496. The court stated:

It is not the province of the court to speculate, conjecture or determine what or how much effect upon a verdict the gross misconduct of a juror or jurors may in fact have in a particular case. While a correct determination might be possible in some cases, the inquiry would be impractical and fruitless in many cases and in all cases contain an element of speculation.

The proper function of the court is to hear the facts of the alleged misconduct and to determine *as a matter of law* the effect reasonably calculated to be produced upon the minds of the jury by such misconduct.

*Butters v. Wann, supra,* 147 Colo. at 356, 363 P.2d at 496–97 (emphasis added). The court then proceeded to state the test to be applied as follows: *"The test is not whether the irregular matter actually influenced the result, but whether it had the capacity of doing so." Butters v. Wann, supra,* 147 Colo. at 357, 363 P.2d at 497 (quoting *Panko v. Flintkote Co.,* 7 N.J. 55, 61, 80 A.2d 302, 305 (1951)).

In *Wiser v. People, supra,* a criminal case involving juror misconduct, the majority did not cite *Butters* in concluding that one juror's use of a dictionary did not require reversal.

The *Wiser* court discussed the requirements of CRE 606(b), which severely limit the court's inquiry into jury deliberations.

CRE 606(b) provides:

Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jurors' attention or whether any outside influence was improperly brought to bear upon any juror. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.

The *Wiser* court then applied virtually the same test used in *Butters,* stating: "We believe that the objective test of whether there is a reasonable possibility that extraneous information or influence affected the verdict should be used to determine if a new trial is required...." *Wiser v. People, supra,* 732 P.2d at 1142.

*Wiser* did not specifically state the applicable standard of review, but the court appears to have proceeded de novo in concluding a remand for a hearing by the trial court was unnecessary because the definition used by the juror had favored the defendant. The court added that "[c]onsidering the reasonable inferences most favorable to the defendant ... we fail to see how he could have been prejudiced by the [jury's] conduct." *Wiser v. People, supra,* 732 P.2d at 1143.

Any question whether the supreme court intended juror misconduct to be treated differently in criminal and civil cases was resolved in *Ravin v. Gambrell,* 788 P.2d 817 (Colo.1990). Previously, in *Gambrell v. Ravin,* 764 P.2d 362 (Colo.App.1988), a division of this court had applied the *Wiser* test in a civil case and concluded, contrary to the ruling of the trial court, there was a reasonable

possibility the jury was affected by a bailiff's misconduct. The division's conclusion appears to have been based on its de novo review. On further appeal, the supreme court upheld the division's ruling, concluding the objective tests set forth in *Butters* and *Wiser* were the same. *Ravin v. Gambrell, supra,* 788 P.2d at 821. Although the supreme court in *Ravin* did not mention the standard of review, in other decisions applying *Butters* and *Wiser,* divisions of this court essentially conducted de novo reviews.

In *T.S. v. G.G.,* 679 P.2d 118, 120 (Colo. App.1984), for example, a case factually similar to the one before us, a division of this court held that a jury foreperson's consultation of a medical textbook in a paternity suit constituted juror misconduct requiring a new trial. During trial there, experts had testified as to the most reliable method of determining paternity. The textbook read by the foreperson stated that human leukocyte antigen (HLA) testing was the most reliable method. Applying the *Butters* test, the division concluded the communication of this information to the other jurors possessed the capacity to influence the jury's verdict. Thus, the division reversed the trial court's ruling to the contrary, explaining:

> There is no dispute here that it was misconduct for a member of the jury to consult extraneous materials even if, as she indicated, the purpose was merely to determine what the initials HLA stood for. That misconduct was compounded when she disclosed to other jurors the result of her research and her opinion relative thereto.
>
> . . . .
>
> The crucial evidence at trial was the testimony of the testing physician and respondent's expert who essentially disagreed as to whether the HLA test, by itself, was sufficient to establish paternity. The introduction of an additional opinion as to the validity or persuasiveness of the test by way of the textbook may well have tipped the balance and influenced the jury in arriving at its verdict. Such acts, by a juror, while deriving from a legitimate concern for a proper result, are nonetheless to be severely [condemned], and if, as here,

they have the capacity to influence the jury the prejudiced party is entitled to a new trial.

*T.S. v. G.G., supra,* 679 P.2d at 119–20 (citation omitted); *see Montrose Valley Funeral Home Inc. v. Crippin,* 835 P.2d 596, 598 (Colo.App.1992)(in light of numerous extraneous matters in deposition to which jury was improperly exposed, "we conclude that there is a reasonable possibility" verdict was tainted).

Decisions from other jurisdictions that have applied a test like the one articulated in *Wiser* also have held that appellate review is de novo. The Ninth Circuit has explained that:

> The judge's conclusion about the effect of the alleged juror misconduct deserves substantial weight. Nevertheless, because of the threat to the fundamental right of defendants to an impartial jury, the trial judge's determination must be considered in the context of the entire record. *We conduct an independent review of the alleged juror misconduct,* but remain mindful of the trial court's conclusions.

*United States v. Steele,* 785 F.2d 743, 746 (9th Cir.1986) (emphasis added); quoting *United States v. Bagnariol,* 665 F.2d 877, 885 (9th Cir.1981); *see also Gibson v. Clanon,* 633 F.2d 851, 855 (9th Cir.1980)("We conclude that there is a reasonable possibility that the extrinsic evidence affected the verdict.").

In *People v. Staggs,* 740 P.2d 21, 23 (Colo. App.1987), the division stated that it was applying the abuse of discretion standard, but appeared to conduct a de novo review in reversing the trial court's finding that a juror's misconduct was incapable of influencing the jury's verdict. The *Staggs* division cited *People v. Thornton,* 712 P.2d 1095 (Colo.App. 1985), *rev'd on other grounds,* 716 P.2d 1115 (Colo.1986), as supporting the abuse of discretion standard.

However, the issue in *Thornton* was whether the trial court abused its discretion in refusing to conduct an evidentiary hearing on allegations that some of the jurors learned certain information during deliberations. The trial court's ruling was upheld on appeal

because most of the affidavits submitted showed the jurors had received the improper information after the deliberations were completed. The juror who recalled otherwise submitted an affidavit stating that the information "didn't affect the deliberations in any way." *People v. Thornton, supra,* 712 P.2d at 1099.

*Thornton* did not cite *Butters,* and it predated *Wiser.* Hence, it relied on other pre-*Wiser* cases that held defendants had to show they were prejudiced by the jury misconduct. *See Torres v. People,* 149 Colo. 314, 369 P.2d 80 (1962), *overruled in part by Callis v. People,* 692 P.2d 1045 (Colo.1984); *People v. Hunter,* 43 Colo.App. 406, 607 P.2d 1026 (1979). The division in *Thornton* also did not mention CRE 606(b), which precludes inquiry into any effect the information may have had on jury deliberations.

The People are correct that in more recent opinions, divisions of this court have applied the abuse of discretion standard of review in juror misconduct cases. For example, *People v. Sherman, supra,* relied on *People v. Hayes, supra,* which, in turn, relied on another division's decision in *People v. Key, supra.* However, *Key* did not involve jury misconduct or apply an abuse of discretion standard.

In *Key,* the division concluded that the trial court's ex parte "scheduling conference" with the jury denied the defendant his right to counsel during a crucial stage of the proceedings. However, the division concluded the error was not structural and did not automatically require reversal, as the defendant urged, and instead applied the harmless beyond a reasonable doubt test. *See Arizona v. Fulminante,* 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991); *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

On review, the Colorado Supreme Court reversed, agreeing with the division's assessment of the standard, but concluding the error was not harmless beyond a reasonable doubt. *Key v. People,* 865 P.2d 822 (Colo. 1994). Again, the abuse of discretion standard was not in issue.

Thus, we conclude that under *Wiser* and *Butters,* we are required to give the normal deference to the trial court's factual findings, but review its conclusions of law de novo. *See People v. Matheny, supra.* To the extent *People v. Sherman, supra,* and *People v. Hayes, supra,* conclude otherwise, we view them as inconsistent with the supreme court's rulings on the standard of review issue.

### B. Application of *Wiser* Test

At the hearing on the motion for new trial, the trial court did not make findings on credibility and appears to have accepted the testimony of all three juror-witnesses as true. Further, the events during deliberations are undisputed. Accordingly, we have conducted our own review of the misconduct and conclude there was a reasonable possibility the outside information affected the verdict.

■ The testimony at the hearing revealed that the jurors had questions about Paxil, an anti-depressant medication. The prosecution had presented testimony at trial that defendant was taking daily medication for stress and holiday season depression. And when defendant testified, she stated she had taken Paxil for two years, from October to March, to relieve holiday-related stress and was taking it on the day of the victim's death.

At the posttrial hearing, testimony was presented that on the first day of deliberations juror R, who had training as an emergency medical technician, volunteered that Paxil was "a very strong drug" used for "serious problems," that it "wasn't an ordinary anti-depressant," and that it was used for people who are antisocial, violent, or suicidal. Juror B, the jury foreperson, asked how Paxil compared to Prozac, another anti-depressant drug, and juror R stated that Paxil was more powerful.

At the suggestion of juror G, the jury sent this note to the trial court: "Why would a doctor prescribe Paxil instead of one of the other anti-depression or anti-anxiety drugs? May we read a copy of a Physicians' Desk Reference?" After consulting with counsel,

the court sent back a note stating, "[T]he Law prohibits supplying reference materials of any kind to the jury. Please reread the instructions." This response by the trial court was appropriate. *See Wiser v. People, supra; Alvarez v. People,* 653 P.2d 1127 (Colo.1982); *Niemand v. District Court,* 684 P.2d 931 (Colo.1984)(error to allow jurors to consult dictionaries to clarify the meaning of legal terms).

Despite this instruction, that evening after court had recessed, juror V downloaded a description of Paxil from the Internet, and the next day he read the following pharmacological description of Paxil to the jury:

Paroxetine (pa-ROX-uh-teen) is used to treat mental depression, obsessive-compulsive disorder, panic disorder, and social anxiety disorder (also known as social phobia).

Paroxetine belongs to a group of medicines known as selective serotonin reuptake inhibitors (SSRIs). These medicines are thought to work by increasing the activity of the chemical serotonin in the brain.

At the suggestion of juror V and possibly juror R, the jurors agreed not to disclose that they had received this information.

On the morning after the verdict was received by the court, juror G contacted the jury foreperson, juror B. They then informed the trial court of what had occurred and their concern that review of the Internet definition had violated the court's instructions. The trial court notified counsel, and thereafter, jurors G, V, and B were examined on the record. Juror G testified that the Internet information was "a little bit more shocking" than what juror R had said.

Juror V was asked whether there was any doubt he was violating the court's instructions by providing the definition. He replied: "Well, no. The letter of the law, but, geez, if [Paxil] was going to be an issue, I felt it [was not] really smart not to have it [when] one of the jurors said she was familiar with it. And, indeed, it showed it was more benign."

Defendant moved for a new trial based on juror misconduct. Initially, the prosecution conceded, and the trial court found, that the introduction of the Internet information was juror misconduct. We agree.

However, the court went on to conclude there was no reasonable possibility that the extraneous information affected the verdict. The trial court reasoned that the Internet definition of Paxil confirmed, rather than contradicted, defendant's testimony that she took the medication to relieve stress and the Internet definition did not support juror R's comments regarding the violent tendencies of people who take the medication. We do not agree.

■ When a defendant contends the defense was prejudiced by juror exposure to extraneous information, the trial court must apply the objective test articulated in *Wiser v. People, supra,* to assess the effect of the information on a typical jury. Thus, a new trial is required "where there is a reasonable possibility that the verdict was tainted by the introduction of outside information or influences into the jury deliberations." *Wiser v. People, supra,* 732 P.2d at 1143.

■ The party alleging juror misconduct may introduce evidence to establish that external matters improperly influenced the verdict. However, how the improperly received information was used by the jurors in their deliberative process is not a proper subject of inquiry. *Vento v. Colo. Nat'l Bank–Pueblo,* 907 P.2d 642 (Colo.App.1995).

This case is factually similar to *T.S. v. G.G., supra,* where the jury foreperson's consultation of a medical textbook in a paternity suit was held to constitute juror misconduct that required a new trial. Applying the *Butters* test, the division concluded the communication of this information to the other jurors had the capacity to influence the jury's verdict. *T.S. v. G.G., supra,* 679 P.2d at 119; *see also Gibson v. Clanon, supra,* 633 F.2d at 853 (new trial required where one juror used an encyclopedia to confirm his belief that blood type AB was rare, and another juror consulted a medical dictionary to determine whether a morphine dosage was too small to have affected a witness's perceptions).

Here, the evidence of defendant's guilt was sharply contested, and there was considerable expert testimony supporting both parties'

positions. Because she took the stand on her own behalf and denied shaking the victim, defendant's possible motive, her state of mind at the time of the offense, and her credibility became key issues. Moreover, she testified that she used Paxil before and on the day of the victim's death.

In our view, the fact that defendant was taking an anti-depressant, anti-anxiety prescription medicine, the type of prescription medicine she was taking, the possible side effects of that medicine, and the implications about defendant's disposition and behavior arising from use of this medication, were of significance to some, if not all, of the jurors. This significance is evidenced by the jury's earlier note to the court asking for further medical information about Paxil.

We disagree with the trial court's determination that the improper information taken from the Internet merely clarified or corrected the information about Paxil volunteered by juror R. The above-quoted language from the Internet contains a number of medical terms, such as "mental depression," "obsessive-compulsive disorder," "panic disorder," and "social anxiety disorder or phobia." While these terms are being used more frequently now in general publications and by the media, they are nevertheless specialized psychiatric terms with complex meanings and connotations, not in the parlance of the average juror and not properly definable by jurors.

We also recognize the problems created by the widespread use and availability of the Internet. Although the Internet has made information more accessible for the average person, the information obtained thereby may be misleading, taken out of context, outdated, or simply inaccurate. Nor is this the first time a juror has looked to the Internet for information during deliberations. *See People v. Kriho*, 996 P.2d 158 (Colo.App. 1999). In view of the problems and dangers associated with the unsupervised use of the Internet, trial courts should emphasize that jurors should not consult the Internet, or any other extraneous materials, at any time during the trial, including during deliberations.

In summary, we discern a reasonable possibility that the introduction of extraneous information about Paxil, in direct violation of the court's denial of the same request by the jury, may well have influenced the verdict. *See Wiser v. People, supra*, 732 P.2d at 1143; *T.S. v. G.G., supra*.

Accordingly, we conclude the trial court erred as a matter of law in determining that the verdict would not have been affected by the information, and we remand for a new trial on that basis.

## IV.

In view of our conclusion, we need not address defendant's related contention that a new trial also is required because juror R imparted specialized knowledge to the jury that turned out to be erroneous and that also tainted the verdict. Similarly, the other issues raised by defendant are unlikely to arise on retrial, and we need not address them.

The judgment is reversed, and the case is remanded for a new trial.

Judge TAUBMAN and Judge WEBB concur.